NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

EMPIRE CORPORATION, Respondent.

No. 74–2179.

United States Court of Appeals, Sixth Circuit.

June 18, 1975.

Rehearing Denied Sept. 2, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, David S. Fishback, N. L. R. B., Washington, D. C., Bernard Levine, Director, Region 8, N. L. R. B., Cleveland, Ohio, for petitioner.

Harvey B. Rector, Gregory Paul Rector, Rector & Associates, Roy E. Browne, Hershey & Browne, Akron, Ohio, for respondent.

Before WEICK, EDWARDS and PECK, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This case is before the court upon the application of the National Labor Relations Board for enforcement of its order issued against Empire Corporation (hereinafter "the Company") on July 30, 1974. The Board's order requires the Company to cease and desist from the unfair labor practices found and from "in any other manner" interfering with its employees in the exercise of rights guaranteed in Section 7 of the Act. Affirmatively, the Company is ordered to bargain upon request with the Union,[1] execute any agreement reached, offer immediate and full reinstatement with back pay to employee Linda Cosavage as well as to twenty-five unfair labor practice strikers illegally discharged, and to post appropriate notices. The Board's decision and order are reported at 212 N.L.R.B. No. 81.

Summarized, the record discloses that the Retail Clerks Union began an organizational effort among the 68 employees at the Company's Akron, Ohio, plastic products manufacturing facility in mid-July of 1973. The Company responded to the unionization campaign by engaging in a variety of what have been found to be unfair labor practices including coercive questioning of union adherents, threats of loss of benefits and discharge, surveillance of union meetings, and promises of pay increases depending upon the employees' refusal to support the Union. These activities culminated in the July 26th firing of employee Linda Cosavage, one of the leading union supporters, allegedly for throwing water upon a co-worker.

Cosavage's discharge led to a midnight confrontation between the chief Union organizer, George Hennigin, and Company president Robert Andrews, in the Company parking lot. Hennigin, having determined that the Union had obtained 35 (a majority of one) signed authorization cards, asked Andrews to reinstate Cosavage and to recognize the Union. Andrews' only response was to place his fingers in his ears and begin walking away. When Hennigin followed him loudly repeating his demands for reinstatement and recognition, Andrews turned and twice sprayed Hennigin in the face with chemical mace. Hennigin retaliated by kicking Andrews in the stomach. Following the mace-kick incident, the Union called a strike which the Board ultimately found to have been an unfair labor practice strike. The Company intensified its efforts to undermine the Union during the strike. After two weeks the 25 workers participating in the strike made an unconditional offer to go back to work, but the Company rejected the offer and informed the strikers that they had been discharged for failure to report to work.

The administrative judge determined that the Company had committed 17 separate unfair labor practices forbidden by Section 8(a)(1) & (3) of the Act. He also found that the Union had obtained a card majority and that a lawful recognition demand had been made upon the Company. Despite the urging of the general counsel, however, he held that the Company was not obliged to recognize the Union. Specifically addressing the application of *N.L.R.B.* v. *Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), he stated that "a fair election [could] be had" and that the Company's "unfair labor practices

1. Retail Clerks International Association, Local 698, AFL–CIO (hereinafter "the Union").

[would] not influence . . . voting at an election conducted by the Board."

Upon review, the Board concluded that the evidence disclosed a number of additional unfair labor practices not enumerated by the administrative judge. Further, unlike the administrative judge, the Board found that "[the Company's] entire course of conduct was so flagrant and coercive in nature as to require that a bargaining order be issued."[2] The Company challenges both the Board's findings with reference to § 8(a)(1) & (3) violations, and its determination that the Company is required to bargain with the Union.

Although the Company is able to cite a certain amount of contradictory testimony, a thorough review of the record shows substantial evidence that it engaged in the various unfair labor practices found by the Board, and accordingly, the attack on the findings must fail. National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N.L.R.B. v. S. E. Nichols of Ohio, Inc.*, 472 F.2d 1228 (6th Cir. 1973). Similarly, we find that the Board acted within its discretion in entering the cease and desist and reinstatement with back pay provisions of the order. *J. P. Stevens & Co.* v. *N.L.R.B.*, 461 F.2d 490 (4th Cir. 1972).

The more difficult question presented, however, is whether the Board was warranted in ordering the Company to recognize the Union on the basis of the card majority. In *N.L.R.B.* v. *Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held "that an employer who engages in 'unfair' labor practices 'likely to destroy the union's majority and seriously impede the election' may not insist that before it bargains the union get a secret ballot election." *Linden Lumber Division, Summer & Co.* v. *N.L.R.B.*, 419 U.S. 301, 95 S.Ct. 429, 431, 42 L.Ed.2d 465 (1974), citing *N.L.R.B.* v. *Gissel, supra.* *Gissel*, like the case at bar, involved interference by an employer's unfair labor practices and a card majority demand for recognition. The Company urges that the present case can be distinguished on three grounds: (1) unlike the union in *Gissel* the Retail Clerks Union obtained but a "bare majority" of autho-

---

**2.** "The Administrative Law Judge . . . concluded that a bargaining order was unwarranted as a fair election could be had 'because nearly all the card signers were in the court room during the trial as witnesses for the General Counsel and, judging from their friendly relation with and representation by the Union, I believe that Respondent's unfair labor practices will not influence their voting at an election conducted by the Board.' . . . Not only was Respondent's prestrike activity more serious and widespread than described by the Administrative Law Judge, but its entire course of conduct was so flagrant and coercive in nature as to require that a bargaining order be issued. Thus, the Respondent violated Section 8(a)(1) and (3) by unlawfully interrogating employees, assaulting a union representative who was requesting recognition, engaging in surveillance and giving the impression of engaging in surveillance, soliciting employees to engage in surveillance, promising wage increases and other economic benefits, threatening to discharge employees and discharging an employee for engaging in union or other protected activity, discriminatorily denying an employee a transfer from one job to another, threatening employee's husband to discourage her union or other protected activity, and unlawfully discharging 25 employees who were engaged in an unfair labor practice strike. . . . Respondent, rather than bargain with the Union, engaged in a series of unfair labor practices to undermine the Union's majority status. These violations were not in any sense minimal but are such as to strike at the very heart of the employees' Section 7 rights and the Union's representative capacity with widespread and persistent effects. We find that the coercive effects of the Respondent's unlawful acts cannot be eliminated by the traditional remedies, and were of a nature as to make a fair election doubtful, if not impossible. Under these circumstances, the purposes of the Act can best be effectuated by reliance on the employees' desires for union representation as expressed by their signed authorization cards rather than on the results of an election conducted in an employer-contaminated atmosphere. Accordingly, we find a bargaining order should issue to remedy the violations of Section 8(a)(1) and (3)."

rization cards in the unit; (2) in the present case the administrative judge and the Board did not agree as to the need for a bargaining order; and (3) four of the employees who signed the cards indicated that Union representatives misled them and misrepresented the purpose of the authorization cards.

Dealing with these contentions in reverse order, we note that the administrative judge ruled all 35 cards valid despite the Company's attempt to prove improper inducement in four specific instances.

> "Although Respondent has attacked some of the foregoing cards as invalid on the ground that they were improperly obtained, I find . . . that those who signed said few cards were not induced to do so by improper solicitations. It follows that I find all 35 cards are valid, and they amount to a majority of those composing the unit aforesaid."

This finding of validity is supported by substantial evidence and we find the Company's contention in this regard unpersuasive.

■ This court may consider the fact that the Board reached a different result than the administrative judge, *N.L.R.B.* v. *Industrial Towel & Uniform Service,* 473 F.2d 1258 (6th Cir. 1973), but the crucial question continues to be whether the Board's determination was based upon substantial record evidence. Furthermore, ". . . the determination of whether unfair labor practices are of such a nature as to warrant the issuance of a bargaining order is for the Board and not the courts." *MCP Restaurant Corp.* v. *N.L.R.B.,* 481 F.2d 75,

79 (2d Cir. 1973). In view of the nature and large number of unfair labor practices found herein we cannot say that the Board's determination that a fair election could not be held was unwarranted.

■ Returning to the Company's initial contention, we consider whether the percentage of the card majority is a critical factor. In *Gissel* and companion cases, the card majorities were as follows: Gissel Packing Co.—31 of 47 unit members; Heck's Inc.—14 of 26 and 21 of 38 unit members; General Steel—120 of 207 unit members. The percentages range from 53% to 65% in *Gissel* as compared with 51% in the case before us. We further note that bargaining orders have been approved in at least two other cases where the majority hinged on a single card. *Self-Reliance Ukrainian Am. Co-op Ass'n* v. *N.L.R.B.,* 461 F.2d 33 (7th Cir. 1972) (7 of 13 unit members signed cards); and *N.L.R.B.* v. *Kostel Corp.,* 440 F.2d 347 (7th Cir. 1971) (2 of 3 unit members signed cards).[3] The Company has failed to cite any authority to support its argument, and in view of the above observations, we conclude that the percentage of the card majority is not a pivotal factor. The important consideration, as pointed out by the Supreme Court in *Linden Lumber, supra,* is the employer's destruction of the laboratory conditions necessary for a fair representation election. That factor is present here and we find the Board's order to bargain well taken.

The petition for enforcement is granted in full.

**3.** It is clear that the Board may, where it finds egregious unfair labor practices, enter a bargaining order even though the union is unable to demonstrate that it represents a majority. *J. P. Stevens & Co.* v. *N.L.R.B.,* 441 F.2d 514 (5th Cir.), *cert. denied,* 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); *N.L.R.B.* v. *Lou De Young's Market Basket, Inc.,* 430 F.2d 912 (6th Cir. 1970).