## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## VALLEY PLAZA, INC., d/b/a Captain Nemo's, Respondent.

No. 82–1420.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1983.

Decided Aug. 12, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Jerry Wohlgemuth, Washington, D.C. (argued), for petitioner.

R. Drummond Black (argued), Midland, Mich., for respondent.

Before JONES and WELLFORD, Circuit Judges, and DeMASCIO, District Judge.*

PER CURIAM.

This case is before the Court upon the application of the National Labor Relations Board (the Board) for enforcement of its order against Valley Plaza, Inc., d/b/a Captain Nemo's. That order requires the company to cease and desist from the unfair labor practices found and from interfering with, restraining or coercing employees in the exercise of their rights under § 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157. In addition, the Board's order requires the company to bargain with the union as the exclusive representative of its employees and to embody in a written document any agreement reached with that union. Finally, the Board also ordered the posting of an appropriate notice.

The company operates a retail complex, the Valley Plaza, which includes a full-service restaurant named Captain Nemo's. The restaurant employs approximately 54 employees, in both full-time and part-time capacities. The center of this complaint involves the company's discharge of five of its dinner waitresses. Sandy Valead and four others were full-time dinner waitresses. It is undisputed that they were the most senior and apparently the most efficient waitresses in the restaurant. Valead, who had been employed at Captain Nemo's for more than six years, was the informal leader among the dinner waitresses and acted as an intermediary between the staff and the restaurant manager, Kristine Selleck.

* The Honorable Robert E. DeMascio, United States District Court for the Eastern District of Michigan, sitting by designation.

In March 1979, the restaurant began serving lunch five days a week. The lunch shift was staffed primarily by the restaurant breakfast waitresses and by volunteers from the dinner shift. Allegedly, most dinner waitresses had made it clear that they preferred not to work the lunch shift because of scheduling conflicts (i.e., child care, full-time schooling, etc.). On the evening of November 5, 1979, Selleck told one of the waitresses that the company was going to require dinner waitresses to work lunches. The company claims that this was a valid business decision since it was difficult to hire waitresses solely for lunch hour work. However, the employees point out that they had begun a union organization drive immediately preceding this announcement. On October 29, Valead and two other waitresses signed union authorization cards at the union's office and picked up cards to distribute to other employees at the restaurant. The union involved is the Catering Industry, Hospital Workers and Bartenders Union, Local 688, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO. Valead was apparently the leader of the effort to solicit signatures from the other employees. On October 30, two other dinner waitresses signed the authorization cards and by November 4, five of the kitchen employees had also signed.

On November 6, Selleck convened an afternoon meeting of the dinner waitresses. The waitresses claimed that they were told that they would be required to work lunches and that the number of dinners they would be allowed to work would be determined by a proration formula based on the number of lunches worked. Selleck claimed that she proposed two alternatives to the waitresses: one would involve assigning each waitress one day a week where she was to work lunch and the other involved the proration system. The waitresses were purportedly upset by the announcements because several of them would be unable to work lunches at all, effectively eliminating their jobs at Captain Nemo's. All seven of the full-time dinner waitresses left the restaurant and went to a nearby bar to discuss the problem. All were sched-uled to work that evening and one reported to the restaurant promptly at 4:00 p.m. The others apparently tried to call Selleck in order to threaten a protest if the problem could not be worked out. After unsuccessful attempts to reach Selleck, a second waitress reported for work at about 5:00 p.m. The remaining waitresses refused to report for work in claimed protest over the new split shift requirement. The two reporting waitresses claimed to have informed Selleck that the other five waitresses were at the "Overpass Bar" and would not be reporting to work because they were upset over Selleck's announcement. Selleck allegedly replied that she would see to it that none of them ever worked in the area again. Selleck testified, however, that no communication of the waitresses' intent not to show up, nor any explanation of their no-show or whereabouts was given to anyone at Captain Nemo's that night. In addition, Selleck denied the comments attributed to her that evening.

A makeshift work force had to be assembled that evening and Selleck herself served as a waitress to help cover for the five that were missing. Just prior to the closing of the restaurant, at about 1:00 a.m., Selleck filled out termination notices for the five absent waitresses. On each form Selleck indicated that the reason for termination was the failure to report to work that evening, and on each form Selleck recommended that the employee not be rehired. The next morning, Selleck allegedly called one of the waitresses on the telephone and commented that the general manager of the restaurant, Gary Pearson, said that the company should thank Valead "for doing the best housecleaning job ever done at Captain Nemo's." All waitresses testified that the gist of Selleck's conversation indicated that they had been discharged. That evening, four waitresses who had previously worked at a restaurant called the Shanghai Peddler, also owned by Valley Plaza President John Rapanos, reported for work at Captain Nemo's.

On November 10, four of the discharged waitresses picketed the motel entrance to

the restaurant, protesting the company's "unfair labor practices," but left the premises on instructions from the company's security guard. That same night, busboy Brian Hopkins held a party at his home at which approximately 17 employees signed union authorization cards. The same four waitresses picketed again on November 13, this time in the parking lot outside the mall entrance to the restaurant.

By November 15, the union had obtained signed authorization cards from 29 of the restaurant's 54 employees (including the fired waitresses) and requested recognition as the collective bargaining representative of the restaurant's employees. The company refused that request. That same day, general manager Pearson conducted meetings with the day and evening shifts to discuss "employee grievances." At that meeting Pearson asked the employees to present their grievances, promised to remedy those grievances, and for the first time told employees that they could bring any problems directly to him. In addition, Pearson announced that the employees would be receiving a raise in their next check as a "Christmas present from him." Pearson also allegedly announced that a follow-up meeting would be held the next week so that employees could see that their grievances were being remedied.

On Friday, November 15, Brian Hopkins was discharged by Selleck. The discharge was purportedly based upon his noncompliance with hair length regulations. On November 21, food manager Armand Prasch called two of the kitchen cooks who had been involved in the union organization and had themselves signed authorization cards and informed them that they were to be laid off. Prasch informed them that the company was going to lay off all part-time help while closing the "Observatory Kitchen", a restaurant in another area of the Valley Plaza, for remodeling. Prasch indicated that it would be too difficult for the company to rearrange the cooks' scheduling or to allow them to work in other kitchens in the motel. This statement was made despite the fact that such schedule changes had often been made and that both cooks

had often been shifted from kitchen to kitchen. Despite Prasch's statements, these two cooks were the *only* part-time employees laid off.

Based on these facts, the Board found that the company had violated § 8(a)(1) of the Act by engaging in the following conduct: coercively interrogating employees about their union activities and the union activities of other employees; creating the impression of surveillance and engaging in coercive surveillance of employee union activities; soliciting and remedying employee grievances and impliedly promising to remedy grievances in order to discourage support for the union; threatening to blacklist employees for having engaged in protected activity; maintaining in effect an overly broad no-solicitation rule; and announcing a wage increase during the organizing campaign in order to undermine support for the union. The Board also found that the company had violated §§ 8(a)(3) and (1) of the Act by discharging the five waitresses and busboy Hopkins and by laying off the two cooks, all in response to their union activity. In addition, the Board found that the company independently violated § 8(a)(1) of the Act by discharging the five waitresses for engaging in protected concerted activity when they stayed off the job in protest of Selleck's announced change in their working conditions. Finally, the Board found that the company had violated §§ 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the union as the representative of a majority of its employees while engaging in the antiunion conduct described. The Board determined that all this conduct undermined support for the union and precluded the holding of a free and fair election. The Board's order, detailed above, was based upon these findings. We find that enforcement of that order is appropriate.

█ By failing to address or take issue with the Board's findings and conclusions with regard to the § 8(a)(1) violations based upon the various forms of coercive activity found, the company has effectively aban-

doned the right to object to those determinations. *See e.g. NLRB v. Tennessee Packers, Inc.,* 344 F.2d 948, 949 (6th Cir.1965); *Dreis and Krump Manufacturing Co. v. NLRB,* 544 F.2d 320 (7th Cir.1976).[1] In addition, the company takes very little issue with the Board's finding that the discharge of busboy Brian Hopkins and the layoff of the two cooks violated § 8(a)(3). Those actions present mixed motive questions calling for an analysis consistent with that laid out by the Board in *Wright Line, A Division of Wright Line, Inc.,* 251 NLRB 1083 (1980), adopted by this Court in *Republic Die and Tool Co. v. NLRB,* 680 F.2d 463 (6th Cir. 1982) and recently approved by the Supreme Court in *NLRB v. Transportation Mgmt. Corp.,* — U.S. —, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). That test requires the general counsel to make a prima facie showing that the employees' exercise of protected rights was a "motivating factor" in the action taken. The burden then shifts to the employer to establish that the discipline or discharge would have occurred in the absence of the protected activity.

Here, there was extensive testimony to the effect that the company, particularly Selleck, was aware of the union activities of Hopkins and of the two cooks in question. While Selleck claimed that the discharge of Hopkins was based upon his violation of hair length regulations, it appears that Hopkins had actually just had a haircut and that, on the day in question, he offered to get another. In addition, the Board found that the testimony established that no other employee had ever been discharged for hair length. Similarly, the evidence clearly established that both cooks had been transferred back and forth among the kitchens in the motel at the Valley Plaza and were both considered two of the most highly qualified cooks on the staff. It is uncontroverted that no other part-time employees were laid off when the two cooks were released. Combining these factors with the history behind the relations between the company and its employees which indicated the presence of antiunion animus, the Board determined that the employer had simply failed to meet the burden of showing that the discharge and layoffs would have occurred absent the presence of union activity. *See J.P. Stevens Co. v. NLRB,* 406 F.2d 1017, 1019 (4th Cir.1968) (evidence of past antiunion animus not only admissible for purposes of determining motive, but should *not* be overlooked in the course of that determination). Considering all relevant factors, the testimony clearly indicating that the company was aware of union activity on the part of these employees, and noting that no other employee had been discharged or laid off for similar reasons, we are satisfied that the Board's findings with regard to these three employees are clearly supportable on the record.

█ The heart of the company's argument on appeal relates to the Board's finding that the discharge of the five dinner waitresses was a violation of §§ 8(a)(3) and (1) of the Act and the Board's decision to fashion a remedy which included the issuance of a bargaining order. Since, on the facts of this case, the two are so closely interrelated, they must be considered in conjunction. Under the appropriate circumstances, the issuance of a bargaining order is clearly within the purview of the Board's discretion when fashioning a remedy for found unfair labor practices. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissel Packing,* the Supreme Court set the standards for the Board's issuance of such an order where it is designed as a remedy for employer unfair labor practices committed during an organizational campaign. The Court made it clear that there are three levels of severity of conduct which the Board must consider in determining whether a bargaining order is the appropriate remedy. *Id.* at 612, n. 32, 89 S.Ct. at 1939, n. 32. Those categories are as follows:

(1) "Exceptional cases," where the employer's conduct amounts to "outrageous

---

1. We are also convinced that, if reviewable, there was more than substantial evidence on the record to support the Board's findings in this regard. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

and pervasive" unfair labor practices, thereby eliminating the possibility of holding a fair election. In such extreme cases, a bargaining order may be issued even though there is no showing of a card majority at any point in time; (2) "less extraordinary cases", where the employer's conduct amounts to "less pervasive practices." In these cases, a bargaining order may be issued if the Board shows that the union had card majority at some point in time and the Board concludes that the employer's conduct was extensive enough to "have a tendency to undermine the majority's strength and impede the election process"; and (3) "less extensive cases," where the employer's conduct amounts to only "minor or less extensive" unfair labor practices, having at most a minimal impact on the election process. In those cases, even given the exercise of the Board's discretion, a bargaining order should not issue.

In the present case, the ALJ apparently analyzed the propriety of issuing a bargaining order under a *Gissel* (2) type of analysis.[2] Accordingly, as is clear from the face of *Gissel* itself, the presence of a union card majority at some point in time is a prerequisite to the issuance of a bargaining order. The company argues that the union never did achieve such a majority status within the bargaining unit. The company bases this argument upon their assertion that the waitresses were not discriminatorily discharged and were either "voluntary quits" or "economic strikers." As the company points out, if the waitresses are deemed voluntary quits, they would not have been included in the bargaining unit, thus making the total number of employees 49 and the total number of employees voting in favor of the union 24, i.e., a nonmajority. Alternatively, the company claims that if the waitresses are deemed economic strikers, then *both* they and their replacements would be included in the bargaining unit,

making the total number 59, with the total number voting in favor of the union through signed authorization cards only 29, again a nonmajority. It is clear that the status of the five discharged waitresses is key to a determination of whether or not the union ever attained an appropriate majority status. The company admits that if it is determined that the five waitresses were discriminatorily discharged, the majority status of the union would be confirmed.

A Board's order is to be enforced by this Court unless that order is arbitrary and capricious, an abuse of discretion, not otherwise in accordance with law or unsupported by substantial evidence in the record. *See e.g. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In determining whether that standard has been met, the factual findings of the ALJ are to be examined for "reasonableness", *id.,* and credibility determinations must be accepted unless it is clear that there is no rational basis for them. *NLRB v. Pittsburgh Steamship Co.,* 337 U.S. 656, 660, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1944); *NLRB v. Mt. Vernon Telephone Co.,* 352 F.2d 977, 979 (6th Cir.1965). The company claims that, despite the strict standard of review, the ALJ's finding that the five waitresses had been discriminatorily discharged is unsupportable, that there is not substantial evidence on the record to justify such a conclusion. We disagree.

While it is true that Selleck and all other relevant management members claim to have been unaware of the union activity at the time of the discharge, there was ample evidence on the record indicating that anti-union animus was a motivating factor. The company contends that the five waitresses effectively quit when they failed to show up for work. The company claims that this is in clear violation of a company rule which requires all employees to inform the mana-

---

**2.** The ALJ addressed this point as follows:
   Although the "setting up" of the dinner waitresses and the discharge of the five best waitresses could be considered "outrageous," and although the remedying of the grievances to undermine the union support was "pervasive," affecting all of the bargaining unit employees, I assume that this case falls under the second category of bargaining cases.

ger whenever they are unable or unwilling to work the shift assigned. The presence of this rule would seem to give rise to a mixed motive analysis under the *Wright Line* approach, discussed above. There was testimony on the record detailing the company's past monitoring of, and negative reactions to, union organization efforts. In addition, it is clear from the record that a new union organization effort had been going on for the week immediately preceding the discharges. There was also testimony indicating that Selleck was fully aware of these activities. The two waitresses who reported for work on the night of the discharge/walkout testified that they told Selleck where the employees were and why they had not shown up for work, and that Selleck responded by threatening to keep them from ever working again. These waitresses clearly indicated that they had emphasized the reasons behind the other waitresses' protest. Finally, there was testimony indicating that when Selleck was asked at the afternoon meeting what her response would be to the waitresses' tender of their notices, Selleck indicated that their replacements had already been interviewed and hired. Though Selleck denied the statements attributed to her and claimed that the discharges, which she effected that same evening, were not in response to union activity, the ALJ found that, in light of the great weight of the contrary testimony, her statements were unreliable.

■ In sum, the ALJ accepted the testimony indicating that Selleck had prompted the walkout, knew where the waitresses were when they failed to show up for work, and had already contemplated the prompt replacement of those waitresses. It is also undisputed that the termination forms were filled out by Selleck that very night. Accordingly, the ALJ and the Board concluded that the waitresses had been terminated by company action rather than by their own wishes. All the company has been able to do in its arguments to this Court is to point out conflicts in the testimony, to attempt to discredit several of the witnesses, and to argue that it would have been unreasonable for Selleck to prompt a walkout in light of

the need for waitresses that evening. Given the nature of the standard under which this Court is to review the determinations of the Board, the company's arguments are simply insufficient. We are unable to conclude that the Board's characterization of the five waitresses as discriminatory dischargees, rather than voluntary quits or economic strikers, is unsupported on the record. As such, the company's argument that the union never achieved the card majority status necessary for a *Gissel* (2) bargaining order must fail.

The company also claims that a bargaining order is inappropriate because the interests of the employees will be better protected by conducting a representation election. The company claims that the interrogation and surveillance found to violate § 8(a)(1) was so isolated and innocuous that it could not be characterized as "pervasive". In addition, they claim that the alleged improper solicitation of grievances and granting of pay raises were not motivated by antiunion animus and therefore could not have any debilitating effect on the prospect of a fair election. Finally, the company claims that the alleged discriminatory discharge of the various Captain Nemo employees should not serve as grounds for a bargaining order since those discharges were at least partially motivated by legitimate business exigencies. Since these actions were not, in the company's view, taken in a calculated effort to undermine the union, the company alleges that they should not serve as a basis for a *Gissel* bargaining order.

The ALJ did consider the possibility of a fair election in over five pages of its memorandum opinion, carefully making those considerations in light of the Board's preference for a representative election where feasible. The ALJ concluded that any remedy without a bargaining order would, as a practical matter, "be putting both the employees and the company on notice that the price for engaging in such flagrant violations of the Act, thwarting the employees' majority support for the union and keeping the restaurant nonunion is no more than potential liability for an unknown amount

of back pay, a risk the company has demonstrated it is willing to take." The ALJ then made extensive findings regarding the futility of a representative election. We do not believe that these determinations were unjustified. As noted, the § 8(a)(1) violations based on coercion and surveillance were wholly undisputed by the company. In addition, as we have concluded, there was substantial evidence on the record to support the Board's conclusion that the discharge of the five waitresses and busboy Hopkins, along with the layoffs of the two cooks, were motivated by antiunion animus and, thus, were violations of § 8(a)(3) of the Act. The pervasive effect of the company's conduct is also emphasized by the fact that the discharge of the five waitresses also amounted to an independent violation of § 8(a)(1) of the Act.

A walkout of unorganized employees is a protected activity under the Act. *See Charge Card Association v. NLRB,* 653 F.2d 272 (6th Cir.1981); *Vic Tanny International, Inc. v. NLRB,* 622 F.2d 237 (6th Cir.1980). In *Vic Tanny,* this Court considered an employer's discharge of four employees who had refused to perform their assigned work and left the premises in order to protest their working conditions in concert. The Court reasoned that § 7 of the NLRA guarantees unorganized employees the right to engage in concerted activities for the purpose of mutual aid or protection as much as it guarantees employees the right to organize unions and engage in collective bargaining. The Court concluded as follows:

> Thus, unorganized employees who jointly participate in a walkout—as in the instant case—to present job related grievances to management are engaged in concerted activity protected by § 7 regardless of whether or not the employees are members of a union. An employer violates § 8(a)(1) by discharging or threatening with discharge employees for such a walkout. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *NLRB v. Leslie Metal Arts Co., Inc.,* 509 F.2d 811 (6th Cir. 1975). We see no distinction in the Act or in the remedies available under the

Act between employees organized in the union and unorganized employees who, nonetheless, joined in concerted actions to deal with their grievances.

622 F.2d at 241. When the waitresses in the present case refused to show up for work and sent word that that refusal was motivated by their desire to protest their working conditions as set out in Selleck's proration formula, they were engaged in concerted protected activity under the Act. The company's discharge of the employees in response to that activity was thus prohibited and amounted to an independent violation of the Act.

In this Circuit, in the first instance, the determination of whether unfair labor practices are of such a nature as to warrant the issuance of a bargaining order is for the Board and not for the courts. *See e.g. NLRB v. Empire Corporation,* 518 F.2d 860 (6th Cir.1975); *NLRB v. Lou DeYoung's Market Basket, Inc.,* 430 F.2d 912 (6th Cir.1970). However, the usual deference to NLRB findings is lessened somewhat when the Board orders the strong and less preferred remedy of a bargaining order without holding an election. *NLRB v. Rexair, Inc.,* 646 F.2d 249, 250 (6th Cir.1981). With this in mind, the Court must review the alleged violations to determine whether they can be deemed sufficiently egregious to warrant a bargaining order under the standards of *Gissel Packing. See NLRB v. Frederick's Food Land, Inc.,* 655 F.2d 88, 90 (6th Cir.1981). Even under this somewhat more stringent standard of review, however, we are convinced that the Board's determination that a bargaining order is the appropriate remedy in this case is fully supported. Not only were the violations found numerous, but they were characterized throughout by a systematic process of discriminatory discharges. The threat of that kind of retaliation would clearly "have a tendency to undermine the majority's strength and impede the election process." After undertaking extensive analysis regarding the company's past unfair labor practices, their impact on election conditions, the likelihood of recurring miscon-

duct, and the potential effectiveness of other less extreme remedies, the ALJ determined that a bargaining order was necessary. The ALJ concluded as follows:

> After balancing all of the competing considerations (including the preference for relying on the results of the Board's own elections rather than the cards), I find that the possibility of erasing the effects of past unfair labor practices and conducting a fair and meaningful election is slight. I therefore find that the employee's sentiment once expressed through the union authorization cards would, on balance, be better protected by the issuance of a bargaining order.

We must agree.

Upon review of the entire record in this case and the various complaints raised by the company in response to the Board's order, we are convinced that each element of the Board's order was supported by substantial evidence. Accordingly, enforcement of that order is hereby granted.

WELLFORD, Circuit Judge (concurring in part and dissenting in part).

I am persuaded with some reservations that the Board in this case has made out a case that the five waitresses were terminated in violation of §§ 8(a)(3) and (1) of the Act in question, although it should be noted that in each instance of controversy the ALJ has credited the testimony of union witnesses and discredited company witnesses, even those who are no longer in the employ of the company and would logically seem to be disinterested. Furthermore, "uncorroborated testimony of an interested charging party does not amount to substantial evidence of an unfair labor practice." *NLRB v. Container Corp. of Am.*, 649 F.2d 1213, 1216 (6th Cir.1981). *See also NLRB v. Elias Bros. Big Boy*, 327 F.2d 421 (6th Cir. 1964); *NLRB v. Otsego Ski Club*, 542 F.2d 18 (6th Cir.1976). There is simply very little, if any, evidence in this record indicating that the company was aware of union activities among the waitresses who refused to report for their shift because of a dispute concerning future work schedules other than uncorroborated testimony of interested charging party witnesses, which itself is somewhat contradictory.

In any event, this is not the " 'exceptional' case[ ]" in which the employer's conduct is so " 'outrageous' and 'pervasive' " that a bargaining order is indicated. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969) (quoting *NLRB v. S.S. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir.1967)). I accordingly dissent from enforcing that type of order in this case.