968 F.2d 1214
 140 L.R.R.M. (BNA) 2872
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
FAMILY FOODS, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
and
United Food and Commercial Workers International Union,
Local 951, AFL-CIO-CLC, Intervenor on Behalf of
Respondent/Cross-Petitioner.
 Nos. 90-6550, 91-5033.
 United States Court of Appeals, Sixth Circuit.
 July 10, 1992.
 
 Before JONES and NORRIS, Circuit Judges, and WOODS, District Judge.*
 PER CURIAM.
 
 
 1
 Petitioner, Family Foods, Inc., seeks review, and the National Labor Relations Board ("NLRB") seeks enforcement, of the NLRB's decision finding that Family Foods violated federal labor law. For the following reasons, the NLRB's order is affirmed in all but two minor respects.
 
 
 2
 * Family Foods owned and operated nine grocery stores in western Michigan. The instant suit involves seven of Family Foods' stores, of which six were located in the Kalamazoo area. These stores included its newest stores in Oshtemo and Portage, Michigan, which opened on November 9, 1987 and November 30, 1987, respectively. Family Foods purchased the two stores from Spartan Stores, Inc., which operated them under the name of "Harding's Friendly Foods" ("Harding's"). Employees at the Harding's stores had been represented by United Food and Commercial Workers International Union ("UFCW") Local 951, except for the meat department at Oshtemo, which had been represented by UFCW Local 539. The seventh store involved here is in Muskegon, approximately ninety miles from Kalamazoo. None of Family Foods' employees at any of the stores are presently represented by a union. Family Foods' owner and chairman is Thomas Duthler Sr. At all material times, his son, Thomas Duthler Jr. ("Duthler"), was Director of Human Resources. Family Foods' president is Jack Duggan.
 
 
 3
 On October 30, 1987, UFCW Local 951 filed a Petition for Representation Election in four separate store units consisting of all of Family Foods' full-time and part-time employees in the Kalamazoo area. On December 3, 1987, the NLRB Regional Director approved a stipulated election agreement. A representation election for all six Family Foods' Kalamazoo stores (including the two newly acquired, former Harding's stores) as a single unit was scheduled for January 14, 1988. On January 11, 1988, UFCW Local 951 filed a separate petition for election at the Muskegon Family Foods' store.
 
 
 4
 Employees cast 329 votes in the Kalamazoo election: 181 votes against UFCW Local 951 and 148 votes for UFCW Local 951. UFCW Local 951 then filed unfair labor practice charges and election objections, as well as "blocking" charges to prevent the representation election in Muskegon. UFCW Local 539 and Janie Albright, a former employee, also filed unfair labor practice charges.
 
 
 5
 The unfair labor practice charges alleged that Family Foods violated section 8(a)(1), (3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3). Of the unfair labor practice charges initially filed, the NLRB General Counsel included about one half in the complaint. A trial was held before an Administrative Law Judge ("ALJ") in Kalamazoo, Michigan from January 23 to 26, 1989 and from February 7 to 8, 1989.
 
 
 6
 On June 13, 1989, the ALJ found that Family Foods had committed various unfair labor practices. Specifically, the ALJ held that Family Foods had violated 29 U.S.C. § 158(a)(1), (3) (1988) by refusing to hire each and every former Oshtemo and Portage Harding's employee due to anti-union considerations. The ALJ held also that Family Foods had discriminatorily discharged Lurlean Martin at the Muskegon store for her union support, and that Family Foods had committed a variety of unfair labor practices, including coercive interrogation of several employees during the pre-election period. The ALJ ordered a remedy that required Family Foods to provide back pay to all former Harding's Oshtemo and Portage store employees, regardless of whether they applied for a job with Family Foods.
 
 
 7
 On July 31, 1989, Family Foods filed timely exceptions to the ALJ's decision. The NLRB General Counsel and UFCW Local 951 filed cross-exceptions. On October 31, 1990, the NLRB affirmed the ALJ's decision. It amended the ALJ's remedy, however, to state that Family Foods is only required to offer employment to all former Harding's employees "who openly sought employment and who would have been hired but for the ... unlawful discrimination." J.A. at 5-6.
 
 
 8
 Family Foods petitioned this Court, pursuant to NLRA, § 10(f), 29 U.S.C. 160(f) (1988), for review of the NLRB's decision.[1] The NLRB filed a cross-application, pursuant to NLRA, § 10(e), 29 U.S.C. 160(e) (1988), for enforcement of its order. On February 5, 1991, UFCW intervened on behalf of the NLRB.
 
 II
 
 9
 Family Foods contends that the NLRB erred in finding that Family Foods unlawfully failed to hire certain applicants at its Oshtemo and Portage, Michigan stores, and that Family Foods unlawfully discharged Lurlean Martin. The standard of review on appeal in a petition for review of an NLRB decision derives from the United States Supreme Court's decision in Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951). This court, in its recent decision in NLRB v. Aquatech, Inc., 926 F.2d 538 (6th Cir.1991), set forth the following concise summary of the standard of review:
 
 
 10
 "The scope of our review of Board findings is well-established: Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal." Kux Mfg. Co. v. NLRB, 890 F.2d 804, 808 (6th Cir.1989). Thus, the Board's findings of fact and its "application of the law to the facts" are subject to the substantial evidence test. NLRB v. Ohio Masonic Home, 892 F.2d 449, 451 (6th Cir.1989). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." Emery Realty, Inc. v. NLRB, 863 F.2d 1259, 1262 (6th Cir.1988) (quoting Roadway Express, Inc. v. NLRB, 831 F.2d 1285, 1289 (6th Cir.1987)). When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and this court ordinarily will not disturb credibility evaluations of the Board or an ALJ, who has observed the witnesses' demeanor. NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984). "[T]he Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it de novo." Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986).
 
 
 11
 Id. at 544 (parallel citation omitted).
 
 
 12
 * First, Family Foods argues that substantial evidence does not support the NLRB's finding of an anti-union motive. Section 8(a)(3) of the NLRA proscribes employer "discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Accordingly, an employer violates section 8(a)(1) and (3) of the NLRA by discharging or taking other adverse action against an employee for engaging in activities in support of union representation. See Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 296-97 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986).
 
 
 13
 Although a new employer is not required to hire its predecessor's employees, the employer violates section 8(a)(1) and (3) of the NLRA by refusing to hire them because of their union affiliation or to avoid a bargaining obligation with the union that represents them. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 40 (1987); Kessel Food Markets v. NLRB, 868 F.2d 881, 884-86 (6th Cir.), cert. denied, 493 U.S. 820 (1989). Where the employer's opposition to union activity is proven to be a motivating factor in its adverse employment decisions, those decisions violate the NLRA unless the employer demonstrates, as an affirmative defense, that it would have made the same decisions even in the absence of the employee's protected conduct. NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 401-03 (1983); Turnbull Cone Baking, 778 F.2d at 296.
 
 
 14
 The question of the employer's motive is a factual matter to be determined by the NLRB, and the NLRB may reasonably infer motive from the circumstances surrounding the employer's actions, as well as from the direct evidence. Birch Run Welding & Fabricating v. NLRB, 761 F.2d 1175, 1179 (6th Cir.1985). Circumstantial evidence supporting an inference of anti-union motivation includes the following: "proximity in time between recent protected activity and measures taken against the employee," Jim Causley Pontiac v. NLRB, 620 F.2d 122, 125 (6th Cir.1980); the employer's demonstrated anti-union bias and the contemporaneous commission of other unfair labor practices, Grand Rapids Die Casting Corp. v. NLRB, 831 F.2d 112, 117 (6th Cir.1987); departure from past practice in instituting the adverse action, Dayton Typographic Serv. v. NLRB, 778 F.2d 1188, 1193 (6th Cir.1985); and disparate treatment of union supporters compared with other employees, NLRB v. Supreme Bumpers, 648 F.2d 1076, 1077 (6th Cir.1981). The NLRB also reasonably considers the inability of the employer's proffered justification to withstand scrutiny. NLRB v. A & T Mfg. Co., 738 F.2d 148, 150 (6th Cir.1984). Of course, direct evidence constituting an outright confession of unlawful discrimination eliminates any question concerning the existence of unlawful reasons for discharge. Turnbull Cone Baking, 778 F.2d at 297.
 
 
 15
 Undisputed record evidence establishes that Family Foods was determined to avoid recognizing and bargaining with a union. As the NLRB found, from the moment Family Foods' employees began to organize a union at the Kalamazoo area stores, Family Foods embarked on a campaign "of intense and widespread animus which permeated the Respondent's [Family Foods'] entire system." J.A. at 36. This campaign is evidenced by numerous and repeated instances of unlawful threats and coercion at each of the seven Family Foods' stores involved herein. Taken together, Family Foods' uncontested violations plainly establish its anti-union animus and bear strongly on the question of Family Foods' motivation for its hiring practices and the discharge of Lurlean Martin.
 
 
 16
 In 1987, while Family Foods was engaged in its anti-union campaign, it purchased Harding's Oshtemo and Portage grocery stores, planning to add those two stores to its retail chain in the Kalamazoo area. In October, Family Foods' Director of Human Resources, Duthler, formed highly favorable impressions of at least twenty-five of the thirty-seven employees he interviewed. Duthler tentatively decided to offer jobs to all former Harding's employees who had favorable ratings. Interrogation and other inquiry confirmed, however, that Harding's stores had long-established, incumbent unions. Hence, Duthler awakened to the risk of having to bargain with the two local unions representing Harding's employees. As a result, Family Foods hired about fifteen former Harding's employees at the Oshtemo store and six at the Portage store, thereby unlawfully denying employment to the remaining employees who wanted to continue work at the stores.[2]
 
 
 17
 Company representatives acknowledged that Family Foods sought to avoid a bargaining obligation at the former Harding's stores and to defeat UFCW's organizational drive. Family Foods counters that two of these representatives, Terry Dykstra and Ronald Scheffler, were not its agents during the relevant time frame, because Family Foods did not hire them until later. Nonetheless, on October 23, 1987, Family Foods' vice-president for store operations, Richard Armbruster, informed Dykstra, Assistant Manager Jerry Roberts, and Meat Department Manager Scheffler that they would be retained in their present positions. In fact, Family Foods admits that "Dykstra, the former Harding's Manager who was eventually hired by Family Foods in November, 1987, participated in many of the October, 1987 Oshtemo job interviews for the purpose of giving his opinion on the Harding's applicants he knew." Br. of Family Foods at 11. This admission, as well as other evidence in the record, is consistent with the fact that Scheffler and Dykstra were treated as Family Foods' employees and, thus, served as its agents.
 
 B
 
 18
 Family Foods contends that, even if it harbored anti-union animus, it would have reached the same hiring decisions at its Oshtemo and Portage stores based on valid business-related factors. Family Foods couches this argument in terms of whether the NLRB should have applied the Wright Line legal standard, under which the employer, after the General Counsel establishes that the protected conduct was a motivating factor in the employment decision, is afforded the opportunity to demonstrate that it would have reached the same decision absent the protected conduct. Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enforced sub nom. NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982). In his June 13, 1989 decision, the ALJ did not expressly cite to Wright Line. In affirming the ALJ on October 31, 1990, however, the NLRB opined in a footnote that the ALJ's failure to cite or apply the Wright Line analysis was not a fatal defect:
 
 
 19
 both with respect to his findings concerning Respondent's [Family Foods'] discriminatory failure to hire and his conclusions regarding the discharge of Lurleen [sic] Martin, the judge tacitly set forth the General Counsel's prima facie case and the Respondent's failure to rebut it. Therefore, we find that the judge's discussion fully satisfies the analytical objectives of Wright Line and no purpose is served by recasting his findings to achieve formalistic compliance with the Wright Line analysis.
 
 
 20
 J.A. at 3 n. 3. Accordingly, Family Foods' citation to Wright Line is a red herring; the real issue is whether the NLRB adequately considered Family Foods' business-related reasons for its hiring at the Oshtemo and Portage stores.
 
 
 21
 Where the employer's proffered reason for adverse actions is shown to be a mere pretext to disguise discrimination--that is, where the reason either did not exist or was not in fact relied upon--the inquiry is at an end. At that point, there is no remaining predicate for any determination that the employer would have taken the actions even in the absence of the protected conduct. Turnbull Cone Baking, 778 F.2d at 296; Republic Die & Tool Co. v. NLRB, 680 F.2d 463, 465 (6th Cir.1982); see Wright Line, 251 N.L.R.B. at 1084.
 
 
 22
 Family Foods attempts once again to obfuscate this issue, this time by arguing that the NLRB erred in not considering each applicant individually. First, an employer's discrimination may take the form of a general scheme or plan to defeat a union by engineering a rejection of applicants who are already represented by a union. See Birch Run Welding v. NLRB, 761 F.2d at 1179. Second, the record reveals that the NLRB examined the reasons for not hiring individual employees, including for example, Family Foods' alleged policy that it would hire only those workers who were willing to work full time and on Sundays, an employee's "attitude," and Family Foods' alleged policy that it would not hire any divisions intact. There is no judicial support for Family Foods' contention that the NLRB must itemize its analysis to fit the list of employees.[3] Furthermore, because Family Foods used these same reasons in support of its hiring at both Oshtemo and Portage, the ALJ and NLRB did not "bootstrap" Portage into Oshtemo by noting that the same conditions existed with respect to hiring at both locations.
 
 
 23
 In any event, the ALJ did in fact analyze Family Foods' attempt to disqualify specific victims of discrimination on an individual basis, focusing on the proffered nondiscriminatory reasons. He concluded that the alleged objections were "either friv[o]lous or wholly unfounded." J.A. at 38. For example, Family Foods sought to justify its refusal to hire particular applicants by treating their requests to work full-time or to avoid Sunday or evening work as a refusal to work on any other terms, when they were in fact mere expressions of preference. Similarly, a number of the employees were singled out because they allegedly would not work weekends. Yet, despite the alleged importance of this issue, not every applicant was asked about willingness to work weekends. Moreover, Family Foods accommodated employees' scheduling preferences at another store, but treated the expressions of such preferences as disqualifications from employment at Oshtemo and Portage.
 
 
 24
 The proffered legitimate reason based on wage differential also fails to withstand scrutiny. The wage rates at Family Foods' Oshtemo and Portage stores were actually higher than the wage rates received by a number of former Harding's employees. Furthermore, a number of the applicants were not asked what wage rate they were seeking, and some applicants indicated that wage rates were negotiable. Accordingly, for each of the employees listed in Family Foods' brief, the NLRB properly disregarded alleged legitimate grounds for refusing to hire based upon the fact that the employee was making a high wage rate at Family Foods.
 
 
 25
 The ALJ did not find credible Duthler's testimony that he found experienced employees less desirable. Accordingly, the applicants listed in Family Foods' brief who were denied employment for excessive experience must also be added to the list of victims of discrimination.
 
 
 26
 Similarly, all former Harding's employees who were refused employment because of alleged poor appearance must be carefully scrutinized. Family Foods claims that Dan Buell and Kevin Rice were not hired because of their very poor appearance and long hair. Both Buell and Rice, however, are currently employees of Family Foods, having been hired after the union election. Family Foods' subsequent hiring of individuals that it claimed to have initially refused because of poor appearance casts into doubt the credibility of this argument as applied to all individuals denied employment for the same reason.
 
 
 27
 The NLRB found unpersuasive Family Foods' attempt at the hearing to explain its hiring only one of three meat department employees notwithstanding a preliminary decision to hire all three. Duthler testified that he was merely following an alleged company policy against hiring intact an entire department within a store, because it would create resentment among those in other departments that were not also hired intact. The ALJ found that Duthler had no reluctance, however, to hire almost all of the deli department and keep that department essentially intact. The ALJ explained this discrepancy as follows:
 
 
 28
 The difference between the two situations was that the Meat Department was a separate bargaining unit [represented by Local 539], while the Deli Department was only a small part of the overall store unit [represented by Local 951]. Hiring a majority of the Meat Department employees meant dealing with the Meatcutters Union [Local 539] while hiring a majority of the Deli Department did not carry with it any bargaining obligation.
 
 
 29
 J.A. at 37.
 
 
 30
 In sum, the NLRB relied on Family Foods' own admissions of unlawful intent, strong circumstantial evidence, including many instances of admitted unlawful conduct, and the inability of Family Foods' explanations for its hiring practices to withstand scrutiny, in concluding that Family Foods was motivated by anti-union considerations and not by any legitimate hiring practices. Indeed, in these circumstances, "there is no other reasonable explanation for the company's pattern of hiring." American Press, Inc. v. NLRB, 833 F.2d 621, 625 (6th Cir.1987).
 
 
 31
 Family Foods argues also that the NLRB's finding of unlawful discriminatory motivation should be set aside because Family Foods did not hire avowedly anti-union employee Luanda Mast, and "because [the Harding's] employees retained [by Family Foods] were just as likely to be [union] supporters as those it did not retain." Br. of Family Foods at 32. As a threshold matter, Family Foods does not cite to evidence in the record demonstrating that Mast was anti-union. Moreover, even if she is anti-union, failure to give her a job would hardly vitiate the abundant evidence showing that Family Foods limited the number of Harding's Oshtemo and Portage employees that it hired so as to avoid dealing with their union. "The focus ... is upon the employer's motive in ordering extensive lay-offs rather than upon the anti-union or pro-union status of particular employees." Birch Run Welding, 761 F.2d at 1180; accord Rust Eng'g Co. v. NLRB, 445 F.2d 172, 174 (6th Cir.1971); Nachman Corp. v. NLRB, 337 F.2d 421, 424 (7th Cir.1964) ("[D]iscriminatory motive, otherwise established, is not disproved by an employer's proof that it did not weed out all union adherents.").
 
 
 32
 There is substantial evidence in the record to demonstrate that Family Foods' refusal to hire otherwise-qualified former Harding's employees was motivated by anti-union animus. To the extent that Family Foods' list of reasons for not hiring the former Harding's employees contained assertions in conflict with other evidence, the ALJ properly resolved these credibility conflicts. The resolution of the credibility conflicts is implicit in the ultimate findings of fact. The final identification of the victims of discrimination will come through the NLRB's compliance proceedings. See supra note 3. To the extent that certain victims have been identified at this point, however, the ALJ properly held that the named individuals comprise part of the class of alleged victims of discrimination.
 
 
 33
 In a related argument, Family Foods contends that the NLRB's relief, at the Oshtemo store, appears to extend beyond the class of twenty-five individuals who Duthler initially decided to hire. The ALJ described the initial screening process as follows:
 
 
 34
 After the interviews were completed, Tom [Duthler] Jr. went over the list of applicants with Dykstra. Dykstra made specific recommendations relating to particular applicants. When Dykstra made a favorable recommendation, Tom Jr. wrote "yes" next to the name on his note pad. He also placed a "no" next to some names. He asked Dykstra if there were any applicants whom Dykstra did not want. Dykstra made specific recommendations against two baggers who were earning close to the minimum wage. He told Tom Jr. he would recommend the hiring of every employee listed in the interview notes next to whose name Tom Jr. had placed either a "yes" or a question mark. There were about 25 such individuals. The only detailed discussion between them related to employees for whom Tom Jr. had placed a "no" on his interview sheets. Tom Jr. testified that he had made a tentative judgment to hire 25 Oshtemo employees listed on his interview sheet.
 
 
 35
 J.A. at 18. Based on these findings, the record clearly supports the view that Family Foods had a legitimate reason for not hiring the "two baggers" mentioned above, as well as the other individuals who had "no" written next to their names. This reason would provide a defense at the compliance stage of this proceeding, although as far as the record shows, the General Counsel has not indicated an intention to seek relief for any of these individuals. See J.A. at 20 n. 12. The exclusion of these individuals does not necessarily mean, however, that the class of victims of discrimination will not extend beyond those of the twenty-five individuals who were not hired. For example, Family Foods claims that it did not hire Michael Sackett and Cathleen Dean because they did not show up for interviews, yet Family Foods admits that it did not preclude either of them from reapplying. If these individuals reapplied but were excluded based on the hiring limit of fifteen, Family Foods cannot rely on their failure to attend the screening interview; it has waived its right to do so by acknowledging that Sackett and Dean were free to reapply. Similarly, there may be other individuals who were not excluded by the initial screening process, and inclusion of them would cause the class of potential victims of discrimination to extend beyond those who received favorable ratings at the initial screening but were not hired.
 
 C
 
 36
 The same principles discussed in part II.B, supra, apply to the discharge of Lurlean Martin. The record belies Family Foods' contention that it treated Martin like any other insubordinate employee based on her refusal to work the express-checkout lane. Martin was the primary instigator of a union organizing drive at the Muskegon store. On April 15, Martin resisted Assistant Store Manager Vince Carlson's direction that she work the express lane a second consecutive shift, protesting that another individual was scheduled to work the express lane. The record shows that the express lane is the least desirable assignment for a cashier because of the fast pace and increased number of customer complaints. Whenever a store manager made assignments, the manager tried not to schedule cashiers for two shifts in a row on the express lane. Occasionally, a cashier is called upon to work two consecutive shifts, but Family Foods has a policy of trying to accommodate employees when this occurs. The usual method of accommodation is to allow two employees to split a single shift on the express lane.
 
 
 37
 On April 15, however, Carlson was unwilling to take Corey Cook, the only other cashier on duty, away from her other duties. By way of compromise, Martin offered to split an express lane shift with a third cashier coming in later that morning--an offer that the NLRB found was "in line with the Respondent's [Family Foods'] past practice." J.A. at 40. But, "[f]or reasons unexplained, her offer was unsatisfactory to Carlson," id., who sent Martin home despite the fact that she and Cook were the only cashiers on duty at the time.
 
 
 38
 Upon his return from vacation, Store Manager Jeff Wellman converted the one-day suspension into an indefinite one. Duthler finally discharged Martin, solely on the basis of what he was told by the store's management and without even a telephone call to Martin herself. Such a failure to investigate alleged insubordination, by discussing the matter with the employee involved, further buttresses the inference of anti-union motive. See NLRB v. M & B Contracting Corp., 653 F.2d 245, 246 (6th Cir.1981).
 
 
 39
 According to Family Foods, Duthler discharged Martin because she was insubordinate. The record shows, however, that, prior to Martin's termination--as opposed to thereafter--"no employee had been fired for insubordination." J.A. at 4. Indeed, although Duthler initially asserted that discharge for insubordination was automatic, he subsequently acknowledged that, in fact, his practice was to suspend insubordinate employees indefinitely, while he looked for mitigating circumstances. Before Martin's discharge, mitigating circumstances had always been sufficient to save any recalcitrant employee from discharge. Substantial evidence supports the NLRB's and ALJ's findings that, based on the record of three other insubordinate employees, Family Foods treated Martin disparately. Because she was a known union supporter, and given other evidence of Family Foods' wholesale effort to crush union activity at its stores, evidence of disparate treatment supports the inference of anti-union motive. See Turnbull Cone Baking, 778 F.2d at 297. Accordingly, substantial evidence supports the view that Martin's insubordination was a pretext rather than a legitimate reason for discharging her.
 
 III
 
 40
 Family Foods contends finally that substantial evidence does not support the NLRB's finding that management unlawfully interrogated employees in connection with a representation election. Specifically, Family Foods challenges the interrogation of Amy Iciek, Robin Cooke, and Janie Albright.[4]
 
 
 41
 "An employer violates Section 8(a)(1) of the Act by coercively interrogating its employees about their union activities." NLRB v. E.I. DuPont de Nemours, 750 F.2d 524, 527 (6th Cir.1984). The basic test for evaluating the legality of an interrogation is " 'whether under all of the circumstances the interrogation reasonably tends to restrain, coerce or interfere with rights guaranteed by the Act.' " Dayton Typographic Serv. v. NLRB, 778 F.2d 1188, 1194 (6th Cir.1985) (quoting Rossmore House, 269 N.L.R.B. 1176 (1984), enforced sub nom. Hotel Employees Union Local 11 v. NLRB, 760 F.2d 1006 (9th Cir.1985)). Among the factors relevant in determining the coercive effect of employer interrogation are the background of employer hostility to unionization, "the nature of the information sought, the questioner's identity, and the place and method of interrogation." Id.
 
 
 42
 In mid-January, shortly before the Kalamazoo-area stores election, Store Manager John Renema demanded to know how teenaged employee Amy Iciek was going to vote and also demanded an explanation for her union leanings. The next day, Renema resumed questioning Iciek and another employee, and threatened loss of existing privileges and job security in retaliation for employees' union support. On October 12, 1987, Store Manager Mitch Cunningham threatened employee Robin Cooke with discharge and other reprisals, solicited grievances with a view towards adjustment, promised benefits to encourage rejection of the union, and asked Cooke if she had heard anyone in the store discussing the union. On October 28, Duthler directed Harding's employee Janie Albright, who was applying for a job at Family Foods' Oshtemo store, to describe the general attitude of the store's employees toward the union. Albright answered that they were against the union. Later, Family Foods attempted to enlist Albright's support to speak out against the union at other Family Foods' stores. Although Family Foods contradicts some of these facts and attempts to portray several of the incidents in a different light, we find that substantial evidence supports the above conclusions.
 
 
 43
 Family Foods does mount a strong challenge, however, to the coercive interrogation of Albright during her job interview. The NLRB concedes that
 
 
 44
 [a]t the end of her interview, Albright asked if the store would have a union. Duthler said that the Company was nonunion but that people were trying to organize one. Albright said, "Don't get me wrong. I am antiunion and I want to know if we were going to be union or not."
 
 
 45
 Br. of NLRB at 8 (citation omitted). The NLRB argues that "[t]he obvious message of this exchange was that the Company was keenly interested in knowing if employees supported or opposed the Union, and expression of opposition could quickly remove barriers to employment." Id. at 25. Although that statement may be a fair inference, the fact remains that Albright initiated the discussion regarding the union. Accordingly, the interrogation could not be coercive as to her. Family Foods' inquiry as to the position of other employees regarding the union, as well as its later attempt to enlist the aid of Albright in campaigning against the union, support the NLRB's finding of a section 8(a)(1) violation. The finding that Family Foods unlawfully interrogated Albright during her job interview, however, is not supported by substantial evidence.
 
 IV
 
 46
 For the foregoing reasons, the NLRB's order is AFFIRMED in all but the following respects. Substantial evidence does not support the NLRB's finding regarding coercive interrogation of Janie Albright during her job interview. Furthermore, Family Foods has demonstrated a legitimate, nondiscriminatory reason for failing to hire those individuals excluded by its initial screening interview at the Oshtemo store, as described in part II.B, supra. Nonetheless, Family Foods' petition for review is otherwise DENIED, and the NLRB's cross-petition for enforcement is otherwise GRANTED.
 
 
 
 *
 The Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Family Foods contests the NLRB's findings that it violated the NLRA by coercively interrogating employees, refusing to hire or delaying the hire of job applicants, and discharging employee Lurlean Martin. Family Foods does not contest the NLRB's findings that it repeatedly violated 29 U.S.C. 158(a)(1) by engaging in numerous instances of coercive and threatening conduct, to wit: numerous other acts of interrogation, as well as threats, unlawful promises of benefits, creating the impression of surveillance of union activities, soliciting grievances, asking employees to campaign against the union, and imposing an overly broad no-solicitation rule against union activities. Accordingly, Family Foods has waived any defense to those findings, and the NLRB is entitled to summary enforcement of those portions of its order designed to remedy the uncontested unfair labor practices. NLRB v. Gentzler Tool & Die Co., 778 F.2d 1211, 1214 (6th Cir.1985); NLRB v. Valley Plaza, Inc., 715 F.2d 237, 240-41 (6th Cir.1983). Furthermore, we agree with the First Circuit that the uncontested violations "do not disappear.... They remain, lending their aroma to the context in which the [contested] issues are considered." NLRB v. Clark Manor Nursing Home Corp., 671 F.2d 657, 660 (1st Cir.1982)
 
 
 [2]
 Family Foods contends that Duthler did not limit hiring to fifteen persons; however, insofar as Terry Dykstra and other witnesses claimed that Duthler did so limit hiring, the matter involves an issue of witness credibility that we will not disturb on appeal
 
 
 [3]
 Similarly, there is no merit to Family Foods' contention that the NLRB's order of reinstatement and back pay to "all former employees of Harding's Friendly Foods, who openly sought employment and who would have been hired but for the Respondent's [Family Foods'] unlawful discrimination," J.A. at 5-6, is overbroad because it does not name the individual victims of discrimination. The practice of deferring the identification of victims of discrimination to the compliance stage of the proceeding is a reasonable approach when circumstances do not readily lend themselves to earlier identification. See Kessel Food Markets, 287 N.L.R.B. 426, 431 n. 26 (1987) (citing NLRB v. International Ass'n of Iron Workers Local 433, 600 F.2d 770, 777-79 (9th Cir.), cert. denied, 445 U.S. 915 (1980)), enforced sub nom. Kessel Food Markets v. NLRB, 868 F.2d 881 (6th Cir.), cert. denied, 493 U.S. 820 (1989). Thus, at the compliance stage of this proceeding, the General Counsel will have the burden of identifying those former Harding's employees who are entitled to relief by virtue of their having "openly sought employment" with Family Foods. Family Foods will also have the opportunity at the compliance stage to litigate its contention that it cannot comply with the reinstatement and notice posting provisions of the NLRB's order because it has sold certain stores. See NLRB v. Cambria Clay Prods. Co., 215 F.2d 48, 56 (6th Cir.1954)
 
 
 [4]
 Family Foods contests a fourth incident of coercive interrogation by President Duggan of employee Darner. We do not reach this issue, however, because although the ALJ found a violation arising from this incident, the NLRB concluded that it was "unnecessary to pass on [the merits of] the interrogation allegation because the remedy would be cumulative." J.A. at 4 n. 4. The ALJ's finding, therefore, is not before the Court