GIANT FOOD MARKETS, INC. and S. S. Kresge Company, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Retail Clerks Union, Local 1557, Intervenor.

No. 79–1248.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1980.

Decided Oct. 23, 1980.

Rehearing Denied Feb. 5, 1981.

John B. Rayson, E. H. Rayson, Kremer, Johnson, Rayson, McVeigh & Leake, Knoxville, Tenn., for petitioners.

Lawrence M. Cohen, Burton L. Reiter, Fox & Grove, Chicago, Ill., for amicus curiae, The Chamber of Commerce of the U.S.A.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before EDWARDS, Chief Circuit Judge, LIVELY, Circuit Judge, and WISEMAN, District Judge.*

* Honorable Thomas A. Wiseman, Jr., District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

1. Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." *See* note 2 *infra* for the relevant provision of section 157.

WISEMAN, District Judge.

Pursuant to section 10(f) of the National Labor Relations Act [NLRA], 29 U.S.C. § 160(f), petitioners ask this Court to review and set aside an order of the National Labor Relations Board [NLRB], holding that they had engaged in an unfair labor practice as defined by section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1).[1] Respondent, in turn, has filed a cross–application for enforcement of the NLRB order. This appeal presents a case of first impression, involving whether or not trespassory area standards picketing in front of one store in a two–store shopping center is protected under section 7 of the NLRA, 29 U.S.C. § 157,[2] and, correlatively, whether or not a demand to leave the private property when unaccompanied by threat or force, is violative of section 8(a)(1).

Petitioners operate two retail stores located in subdivided portions of a privately–owned building in Knoxville, Tennessee. Separating the building from the public thoroughfare is a private parking lot designed to accommodate both businesses. The property owner, Wiggins & Co., Inc., leased the building to S.S. Kresge, which operates a K–Mart store in one part of the building. Until 1976, S.S. Kresge, in turn, subleased the other part of the building to Allied Food Corporation, which had entered into a collective bargaining agreement with the intervenor Retail Clerks Union. In early 1976, Allied Food closed its store, terminated its employees, and cancelled its sublease with S.S. Kresge. On January 30, 1976, S.S. Kresge entered into a sublease with Giant Foods, which began operating a retail grocery store in April of 1976 in the

2. In pertinent part, section 7 provides that "[e]mployees shall have the right to self–organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of* collective bargaining or other *mutual aid or protection* ...." (emphasis added).

same portion of the building previously occupied by Allied Foods.

In contrast to the former employees of Allied Foods who had been covered under a collective bargaining agreement, the newly hired employees of Giant Foods were not unionized. It came to the attention of the Retail Clerks Union that Giant was not providing the same benefits previously offered by Allied Foods and currently provided by at least one chain of retail grocery stores in the area whose employees were unionized.[3] On the basis of such information, the union began to picket in front of the Giant Foods store on April 5, 1976, the day Giant opened for business. The group of four to eight pickets included former Allied employees, none of whom were hired by Giant, and paid pickets employed by the union. They carried placards informing the public that Giant was not paying wages and

benefits commensurate with the standards offered in the area and asking that consumers not shop at Giant.[4] They also distributed handbills that included a similar, although more detailed, message to potential Giant shoppers.[5] All indications from the record show that the pickets were peaceful and did not interfere with respondents' businesses.

On the first day of picketing, a representative of Giant and Kresge informed the pickets that they were located on private property and demanded that they leave. The demand was unaccompanied by any threat or force. The pickets, however, did not leave and. returned the next day. Thereupon, Giant, Kresge, and Wiggins applied for a temporary restraining order in Chancery Court for Knox County. The court granted such an order ex parte, and the pickets were served that day.[6] As a

3. Testimony adduced at the NLRB hearing in front of the administrative law judge indicated that, although information about wages and benefits provided by Giant Foods did not come directly from Giant, the union had reason to believe that such benefits were not comparable to those previously offered by Allied Foods. The newspaper advertisement placed by Giant seeking applications for employment did not list the same benefits. The union was also aware that a Giant store in a nearby community that had been in operation for some time did not offer comparable benefits. Finally, the union had information that the salaries of the Knoxville Giant employees were not as high as those previously paid by Allied. From the record it appears that at no time during any of the proceedings did Giant ever deny that it was not providing benefits comparable to those previously offered by Allied. *See* note 12 *infra*.

4. The picket signs read as follows: "Informational Picketing–Giant Food Markets does not pay area standards, wages and benefits. Please don't shop. Retail Clerks Union, 1557, 203 North 11th Street, Nashville, Tennessee."

5. The handbill read as follows:
   INFORMATIONAL PICKETING
   This picketing is not to prevent deliveries from being made or to stop employees from working. This is our way of informing you, the buying public, of a situation that has cost several Knoxville citizens their jobs.
   Allied Foods Corporation sold this store to Giant Foods Markets, Inc. Giant Food Markets did not employ the employees who were working at the store they bought. These

employees were making good wages and benefits. Now they are on unemployment benefits and food stamps–all thanks to Giant Food Markets.
   This company now wants you to welcome them to this city with open arms! Do they derseve (sic) such a welcome? We say no– never!
   Giant Food Markets not only brought wages, working conditions and benefits below area standards to this store, they created unemployment for the employees previously working in this store.
   PLEASE DON'T SHOP
   Your Support Will be Greatly Appreciated
       Retail Clerks Union, Local 1557 AFL–CIO
       203 North 11th Street
       Nashville, Tennessee 37206
   From the testimony at the hearing in front of the administrative law judge, it appears that the union erroneously believed that Allied had sold its store to Giant. That misunderstanding accounts for the first statement in the second paragraph of the handbill.

6. The day after the Knox County Chancery Court granted the TRO, the court held an adversary hearing and issued a preliminary injunction. In September of 1976, however, after the union had filed a complaint with the NLRB, *see* text *infra*, the court reconsidered its decision and held that, under *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), which had been decided in the interim, state court jurisdiction was preempted by the NLRA. *Wiggins & Co. v. Retail Clerks Local 1557*, No. 57199 (Knox County Ch., Tenn., Sept. 9, 1976). On appeal, after the decision in the

result, they moved to a grassy area just outside the shopping center property line and adjacent to entrances and exits to the center. With ten to twelve pickets at a time, they continued picketing for approximately two months.[7]

On April 29, 1976, the union filed an unfair labor practice charge with the NLRB. The charge stated that Giant, Kresge, and Wiggins had violated section 8(a)(1) by "denying [them] the right to peacefully picket the employers (sic) premises for the purpose of truthfully informing the consumer public . . . ." In January of 1977, the NLRB issued a complaint stating that the union had been prohibited from picketing and handbilling in front of Giant Foods. Although it was not originally clear specifically about what the union was complaining, by the time the case was heard, the charge was distilled into a complaint that respondents had violated section 8(a)(1) by demanding that the pickets leave when, under section 7, they were engaged in legal, protected activity. After a hearing, the administrative law judge dismissed the complaint, holding that respondents' demand that the pickets remove themselves from private property was not violative of section 8(a)(1) and that, therefore, it was unnecessary to determine whether or not the union was engaged in conduct protected under section 7 of the NLRA. The Board reversed, holding that the respondents had violated section 8(a)(1) and that the union

activity was protected under section 7. *Giant Food Markets, Inc.*, 241 N.L.R.B. No. 105, 100 L.R.R.M. 1598 (1979).[8]

The law addressing the right to picket and/or solicit on private property has undergone major changes in the last thirty-five years. Extending the rationale of *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1945), in which the Supreme Court held that pamphleting in a company-owned town was protected under the First Amendment, the Court in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), determined that a privately owned shopping center could not prohibit area standards picketing in its parking lot. The Court subsequently addressed the *Logan Valley* situation in a case involving handbilling by war protesters in the mall area of a shopping center. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). The Court distinguished *Lloyd* from *Logan Valley* since the handbilling activity was unrelated to any of the operations of the shopping center. By holding that the war protesters had no First Amendment right to engage in handbilling on private property in the form of a shopping mall, the Court made no ostensible attempt to overrule *Logan Valley*. Although the *Lloyd* Court distinguished *Lloyd* from *Logan Valley* by stating that the method chosen by the union in *Logan Val-*

---

intervening case of *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Tennessee Court of Appeals reversed and reinstated the preliminary injunction. *Wiggins & Co. v. Retail Clerks Local 1557*, No. 375 (Tenn.Ct.App., Mar. 28, 1979). Subsequent to the decision of the NLRB, holding that Giant and Kresge had committed an unfair labor practice, *see* text *infra*, the Tennessee Court of Appeals reheard the case but did not alter its original decision. *Wiggins & Co. v. Retail Clerks Local 1557*, No. 375 (Tenn.Ct.App., May 25, 1979). The Tennessee Supreme Court reversed on the narrow issue presented to it and held that, once the NLRB had rendered a decision on the merits of the case, state court jurisdiction was preempted. *Wiggins & Co. v. Retail Clerks Union Local 1557*, 595 S.W.2d 802 (Tenn.1980). For a history of the state proceedings in this case and an in-depth discussion of federal and state jur-

isdiction in cases of this nature, *see* Comment, *Labor Law Preemption after Sears–Problems in Concurrent Jurisdiction–Wiggins & Co. v. Retail Clerks Local 1557*, 47 Tenn.L.Rev. 373 (1980).

7. The union official who testified at the NLRB hearing in front of the administrative law judge stated that the picketing continued for at least two months but that it was not continuous during that period. He also concluded that "it was obvious that this move [to the parking lot entrance] rendered us completely ineffective . . . ."

8. The Board did uphold the administrative law judge's dismissal as it applied to Wiggins & Co. since Wiggins did not participate in making the demand. The dismissal of Wiggins is not before this Court on appeal.

*ley* was the only reasonable opportunity for the pickets to communicate their message to their intended audience, this distinction was interwoven with and appeared to be subordinate to the fact that there was no special connection between the protest and the shopping center itself. Were it still possible to conclude that the First Amendment protections enunciated in *Logan Valley* would survive *Lloyd* if union picketing related to the operations of a private shopping center, such an inference was diluted by the Court on the same day in its decision in *Central Hardware Co. v. NLRB*, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972). In *Central Hardware*, the Court was presented with a case involving union solicitation by nonemployees in the parking lot of a single store. Although the union activity was indeed related to the operation of the hardware store, in contrast to the facts of *Lloyd*, the Court distinguished the case from *Logan Valley* by holding that the First Amendment comes into play only when the privately owned property has significantly assumed the function of public property. 407 U.S. at 547, 92 S.Ct. at 2243.

Neither *Central Hardware* nor *Lloyd* explicitly overruled *Logan Valley* so that, as of 1972, it appeared that the First Amendment was still relevant if the union engaged in activity on private property that was the functional equivalent of a public town or some large portion thereof. It was, therefore, possible to assume that, based on *Logan Valley*, union activity in a large shopping center would be protected under the First Amendment, but, based on *Central Hardware*, similar activity on the private property of one store would not be so protected. In 1976, however, what remnants of *Logan Valley* that remained after *Lloyd* and *Central Hardware* lost total vitality in *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). The Court in *Hudgens* announced that, although *Logan Valley* had not previously been explicitly overruled, the implicit repudiation had been clear. The message of *Hudgens* was unequivocal: *Logan Valley*, if not already effectively eroded, was officially overruled. Since First Amendment protections do not apply at all to union pickets on the private property of a shopping center, no matter what its size, the rights of pickets would thereafter be determined strictly and solely by resort to the protection given them under section 7 of the NLRA. The protection must be balanced against the private property rights of the property owner under the standard set a quarter of a century ago in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1955).

In *Babcock & Wilcox*, the Court addressed the conflicting interests of organizational rights of nonemployee union organizers and the private property rights of the owner of a fenced–in, company parking lot that existed solely for the use of the company's employees. Although the property itself was a far cry from the sprawling shopping mall in *Logan Valley* or even the more public parking lot in *Central Hardware*, the principles laid down in *Babcock & Wilcox* are now controlling in any case involving the interplay between private property interests and a union's statutorily protected rights. Through *Babcock & Wilcox*, the Board is charged with the knowledge that a private property owner may legally bar union activity if "reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message . . . ." 351 U.S. at 112, 76 S.Ct. at 684, 100 L.Ed. 975.[9] The Board must, therefore, apply a standard of accommodating the private property rights with the union's rights "with as little destruction of one as is consistent with the maintenance of the other." *Id.*

In *Babcock & Wilcox*, as in any case involving organizational activity, the goal of the union was to communicate with the employees. Assuming that there would not have been an effective, safe, alternative means of distributing literature to employees coming to or leaving the workplace oth-

---

**9.** The employer is also prohibited from discriminating against the union by allowing other distribution while barring comparable union activity. *Id.*

er than in the parking lot of the employer, the Board must consider whether or not there were effective alternative methods of communicating with the employees away from the workplace. When communication by mail, phone, or in person is possible and feasible, the employer may be able to bar absolutely nonemployees from its property.[10]

The situation confronting this Court, however, does not involve a union's attempt to communicate with employees. In this case, the union was engaged in area standards picketing, and the intended audience was comprised of consumers and potential patrons of Giant Foods.[11] Although there may be secondary, ripple effects on the employees of a picketed employer in area standards picketing, there is no real challenge to the union's position that it was truly engaged in area standards picketing in this case.[12] It is also beyond dispute that area standards picketing is lawful and protected under section 7 of the NLRA. *See Hod Carriers Local 41 (Calumet Contractors Assn.)*, 133 N.L.R.B. 512, 48 L.R.R.M. 1667 (1961). Although Justice Stevens, writing for the Court in *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 206 n.42, 98 S.Ct. 1745, 1762 n.42, 56 L.Ed.2d 209 (1978), described area standards picketing as a recently evolved right, its mere lack of longevity should make it no less protected at this juncture.[13] *Babcock & Wilcox* specifi-

---

10. In contrast, if the location of a plant and residences of the employees "place the employees beyond the reach of reasonable union efforts to communicate with them," the employer must permit union activity on his property. 351 U.S. at 113, 76 S.Ct. at 685, 100 L.Ed. 975.

11. In its decision below, the Board described area standards picketing as follows:

   Area standards picketing is engaged in by a union to protect the employment standards it has successfully negotiated in a particular geographic area from the unfair competitive advantage that would be enjoyed by an employer whose labor cost package was less than those of employers subjected to the area contract standards. Failure to protect these standards could result in an undermining of wage and benefit gains in such areas. Therefore, in its attempt to protect the area standards, a union acts not only in its own interest, but in the interest of employees of employers with whom it has negotiated more beneficial employment standards.

   *Giant Food Markets, Inc.*, 241 N.L.R.B. No. 105, 100 L.R.R.M. 1598, 1599 (1979).

12. Although petitioners specifically raise the issue of whether or not there was substantial evidence in the record to support the conclusion of the Board that the union was engaged in area standards picketing, they relegated ·the discussion to a footnote in their treatment of the section 7 question. Petitioners suggest in that footnote that the union was not engaged in bona fide area standards picketing but gave their activity that description to protect what was really organizational or recognitional picketing from the prohibition of section 8(b)(7), 29 U.S.C. § 158(b)(7). Although the thoroughness of the investigation by the union of the benefits provided by Giant Foods may be questioned, there was no evidence presented at the hearing to call into question the union's good faith in premising the picketing on a belief that Giant Foods posed a threat to area standards.

   As the union suggests, it might be inferred that petitioners did not seriously question that the pickets were engaged in area standards picketing from the fact that they did not file an unfair labor practice themselves. The union further contends that the picketing falls within the exception to the Act's prohibition in section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C), which allows

   picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

   It is not necessary to address the applicability of this section because we have determined that there was a reasonable basis for the union to believe that Giant did not conform to area standards. *See* note 3 *supra.* Considering the record as a whole, there is substantial evidence to support the conclusion of the NLRB that the union was in fact engaged in area standards picketing, especially in light of the lack of any countervailing evidence that the purpose of the picketing was actually recognitional or organizational. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1955).

13. In *Sears*, the Court addressed the question of whether or not state jurisdiction over trespass actions for injunctive relief is preempted by the NLRA when the trespass involves nonemployee union activity on the employer's private property. The issue of area standards picketing, which could arguably describe the

cally centered on the organizational rights of nonemployees, but its rationale and principle of accommodation logically applies to any protected union activity. It is, therefore, necessary to fit this case into the *Babcock & Wilcox* construct and thereby balance the conflicting rights while exploring the potential alternative means of communication with the intended audience.

It may be assumed that, in general, it will be easier to communicate with a specific, discrete number of employees by means other than intrusion on private property than to communication with potential consumers of a large retail store located on a major thoroughfare in a metropolitan area. This assumption, however, leads to a rather anomalous conclusion that private property rights may have to yield more often to the protected right to engage in area standards picketing than to other union activities for which the law has forged a long–standing protected status. Perhaps this result is inevitable because the focus of the inquiry involved is on the intended audience.

■ If area standards picketing is protected under section 7 of the NLRA, no matter how long the protection has existed, area standards pickets must be allowed a reasonable means of communicating with the consumers. When the consumers potentially come from a large metropolitan area and cannot be categorized as a specific group patronizing a specific type of store, expensive, extensive mass media or mailer campaigns should not be required. If reasonableness is a criterion for determining whether or not an alternative means of communication exists, the union should not be forced to incur exorbitant or even heavy expenses. A mass media campaign would also diffuse the effectiveness of the communication by being physically removed from the actual location of the store whose policies are at issue and would prevent any personal contact between the union and the

union activity in that case, was not specifically before the Court, but the parties in this case have latched on to Justice Stevens' dicta in his discussion of area standards picketing to support their respective contentions. For purposes of his analysis, Justice Stevens conceded that trespassory area standards picketing may be at least arguably protected. 436 U.S. at 205, 98 S.Ct. at 1761. He indicated doubts that area standards picketing should be treated in the same manner as other union activity in the *Babcock & Wilcox* accommodation analysis, *see* text accompanying note 9 *supra*, and pointed out that trespassory activity has generally been held to be less protected than activity that involves employees of the employer being picketed. *Id.* at 205–06, 98 S.Ct. at 1762. When the employees are legitimately on the property of their employer by virtue of their employment, it is the employer's management interests, rather than his property interests, that may have to yield to the union's protected rights.

When nonemployees are engaged in trespassory activity, they must meet the heavy burden of showing that other reasonable means of communication are not available. *Id.* at 205, 98 S.Ct. at 1761. Since other reasonable means may be available when the intended audience consists of employees, *see NLRB v. Babcock & Wilcox Co., supra; Sabine Towing & Transp. Co. v. NLRB*, 599 F.2d 663 (5th Cir. 1979), the Board and the courts have rarely upheld trespassory organizational activity. 436 U.S. at 205, 98 S.Ct. at 1761, 56 L.Ed.2d 209. After *Sears*, however, it remained to be seen how the Board and the courts would deal with trespassory area standards activity. Justice Stevens voiced his reservations about the protection given area standards picketing since he believed that it is not at the "core of the purpose for which the NLRA was enacted" and does not have a "vital link to the employees located on the employer's property." 436 U.S. at 206 n.42, 98 S.Ct. at 1762 n.42, 56 L.Ed.2d 209. As Justice Brennan pointed out in his dissent, however, Justice Stevens relied substantially on the *Babcock & Wilcox* language for his conclusion that trespassory picketing by nonemployees is disfavored. Justice Brennan noted that the factual situation in *Babcock & Wilcox* was far different from that of "peaceful nonobstructive picketing on a parking lot which is open to the public." 436 U.S. at 321, 98 S.Ct. at 1769, 56 L.Ed.2d 209. Justice Blackmun, in his concurrence, also expressed concern with Justice Stevens' analysis by stressing the fact that the Board has not had much opportunity to deal with trespassory area standards picketing under a pure *Babcock & Wilcox* analysis since it has been "diverted" by the First Amendment considerations of *Logan Valley* until it was irrevocably overruled by *Hudgens* in 1976. Although Justice Stevens did command a majority of the Court, there was far from unanimity on his dicta relating to area standards activity. It would be stretching this dicta too much to conclude that his statements were necessarily meant as pronouncements for the future rather than descriptions of the past.

intended audience. In this case, the choice is not between disseminating information through the media away from the store itself and on–site picketing. Instead the choice is between locating the pickets on the private property near the entrance of the store and locating them across the parking lot on public property adjoining the thoroughfare and near the entrance and exit to the parking lot.

The Board in this case held that picketing at the parking lot entrance was not an effective, reasonable means of communication. In making the necessary accommodation between the conflicting interests as required by *Babcock & Wilcox*, the Board noted that the union's message would be diluted by a requirement that picketing take place at a substantial distance from the store entrance and that picketing at the entrance to the shopping center would enmesh a neutral employer, S.S. Kresge, in the dispute.[14] By holding that picketing at the parking lot entrance was thus ineffective, the Board reversed the decision of the administrative law judge. The law judge had not, however, addressed the issue of whether or not the pickets were engaged in protected section 7 activity next to the Giant Foods store. Instead he determined that the simple demand to leave the premises was not an 8(a)(1) violation. According to his analysis, there was no need to consider whether or not the pickets were protected under section 7.

The problem with the approach taken by the administrative law judge in initially addressing the 8(a)(1) issue is obvious: whether or not the union activity is protected under section 7 becomes irrelevant. According to the law judge, when an employer peacefully asks or demands that the pickets leave but they do not in fact leave, and the employer then seeks and is granted a state injunctive order for them to leave, and the employer does not file an unfair labor practice charge, the underlying issue of whether or not the pickets were engaged in protected activity goes unresolved.[15] Since filing for injunctive relief has been deemed not to violate section 8(a)(1), *see Clyde Taylor Co.*, 127 N.L.R.B. 103 (1960), the union is left without recourse, and the state of the law continues to remain uncertain. The analysis of the law judge may be logically consistent because a demand to vacate is a condition precedent to filing a trespass action.[16] The demand thus becomes an integral part of the state court action that is not itself an unfair labor practice. There must, however, be a mechanism for resolving the section 7 question. The illogic and unfairness of leaving that issue unanswered may transcend the questionable logic of determining that a peaceful demand to leave is an 8(a)(1) violation.

The method available to the union to determine whether or not the activity is protected under section 7 is through filing an 8(a)(1) charge with the NLRB. These issues are intertwined and cannot be dealt with separately. Addressing the section 7 question without considering the 8(a)(1) issue ignores the crux of the case. On the other hand, if the Board finds that the activity is protected, it must proceed to consider the 8(a)(1) charge. Two approaches are then apparent even though neither is particularly appealing. The Board could find that, although the activity was protected, a peaceful demand to cease that activity is not violative of section

---

14. Apparently, Kresge did not view the situation as the Board did since it identified its interests with that of Giant by joining Giant in its application for injunctive relief against the union in state court.

15. It is not clear from the administrative law judge's opinion whether or not he would have found an 8(a)(1) violation if the pickets had in fact left as requested. There would seem to be no reason, however, that compliance with the demand should be determinative.

16. In its appellate brief, the union has conceded that a demand to leave is a condition precedent to instituting the state court action. Additionally, Justice Stevens indicated in *Sears* that "in order to avoid a valid claim of pre–emption" a demand to leave is required by federal law. 436 U.S. at 207 n.44, 98 S.Ct. at 1263 n.44, 56 L.Ed.2d 209.

8(a)(1). Alternatively, once a finding has been made that the activity is protected, the demand to leave is automatically determined to be a violation.[17] The appropriate approach to this problem should be devised, in the first instance, by the Board.

■ Rather than holding that the section 7 issue should have been decided at the outset before addressing the section 8(a)(1) question and thus referring the matter back to the administrative law judge, the Board determined that the union activity was protected and then went on to reverse the decision of the administrative law judge on the issue of the 8(a)(1) violation. Since the decision of the Board was not based in any part on the conclusions of the administrative law judge, it must be assumed that the Board came to its own conclusions from the record of the proceedings before the law judge and/or on the basis of its knowledge of and expertise in labor relations gleaned from experience in addressing cases of a similar nature. Both parts of this assumption are, however, troublesome. Both the dilution of message and enmeshing neutral employers theories, which appear to be at the crux of the Board's opinion, are cited by the Board without case authority and, perhaps more importantly, without reference to supporting facts in the record.

The entire testimony before the administrative law judge was presented by E. L. Collins, President and Chief Executive Officer of Local 1557 of the Retail Clerks Union. Mr. Collins did not participate in the picketing and, therefore, could not lend any insight from his personal knowledge of the events that took place. In fact, he was only vaguely familiar with the location of the shopping center. Mr. Collins could only testify as to matters involving the administration of the picketing and the information he had received prior to the commencement of the picketing. His primary purpose in testifying appeared to be to establish that the union activity in question was in fact area standards picketing.

There was no evidence presented about whether or not relocating the pickets at the entrance of the parking lot actually diluted the union's message. Presumably such testimony could have been elicited from pickets who were at the scene. They could have testified about the effectiveness of picketing in front of Giant Foods the first two days as compared with the efficacy of picketing near the entrance to the parking lot. Similarly, the pickets might have had knowledge about whether or not the neutral employer had been enmeshed in the controversy. Additionally, representatives from S.S. Kresge could have given information about whether or not it was unwittingly affected by the picketing. Other facts having bearing on the reasonableness of the alternative locations could have been elicited from various sources. For instance, there is no evidence in the record pertaining to the traffic flow or degree of congestion on the thoroughfare adjoining the parking lot, how often cars turn into the parking lot, how much opportunity occupants of cars have to observe and read the picket signs, whether or not the pickets had an opportunity to converse with the consumers, what methods are used to measure the effectiveness of area standards picketing, or the reasons the union judged the picketing near the parking lot entrance ineffective. The Board's holdings that the picketing at the parking lot entrance would dilute the union's message and tend to enmesh a neutral employer have the force of logic, but the Board made these conclusions almost as if by judicial notice without the benefit of supporting evidence in the record.

This Court cannot find, on the record as a whole, that there is substantial evidence to support the findings of the Board. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). The order of the NLRB is, therefore, set aside and the case remanded to the Board to take further evidence on the questions presented.

17. In *Sears*, Justice Stevens at least suggests that the Board could reasonably find that a demand to leave was an unfair labor practice.

436 U.S. at 207 nn.43, 44, 98 S.Ct. at 1263 nn.43, 44, 56 L.Ed.2d 209.