EMERY REALTY, INC., Petitioner,
Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross–Petitioner.

Nos. 87–6279, 88–5044.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 17, 1988.

Decided Dec. 19, 1988.

**1260**

David L. Barth (argued), Paul R. Moran, Cors, Bassett, Kohlhepp, Halloran and Moran, Cincinnati, Ohio, for Emery Realty, Inc.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Collis Suzanne Stocking, Margaret G. Bezou (argued), Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, Gerald Kobell, Regional Counsel, N.L.R.B., Region 6, Pittsburg, Pa., for N.L.R.B.

Before MERRITT, MARTIN and MILBURN, Circuit Judges.

MILBURN, Circuit Judge.

Emery Realty, Inc. ("Emery") petitions to set aside a National Labor Relations Board's ("Board") order requiring it to allow nonemployee union representatives to distribute union handbills on its property (No. 87–6279). On cross-application, the Board seeks to have its order enforced (No. 88–5044). The Board's decision and order are reported at *Emery Realty Inc.*, 286 N.L.R.B. No. 32, 126 L.R.R.M. 1241 (Sept. 30, 1987). For the reasons that follow, we deny Emery's petition to set aside and grant enforcement of the Board's order.

## I.

Emery owns and operates the Carew Tower complex in downtown Cincinnati, Ohio. It includes an office building, a hotel, and commercial space rented by various retail stores and service shops. The main lobby of the complex, the "Arcade," runs between the office and hotel spaces at ground level and spans the distance of a city block between two streets. The Arcade stores and shops face into the center walking space, which varies in width from thirty-five feet at center to twenty-five feet at its ends. The Arcade has two main public entrances from the streets at either end, and there are other entrances from the hotel, the office building, a large department store, and from a public elevated skywalk system that connects several downtown buildings. Some of the entrances are closed at night, but the Arcade itself is open seven days a week, twenty-four hours a day, except for one hour each year when Emery closes all the public entrances. Emery provides security guards who patrol the Arcade around the clock.

Emery has no written policy prohibiting distribution or solicitation in the Arcade, but it has occasionally enforced an unwritten rule against such activity. Emery has permitted the Salvation Army, the Shriners, the Girl Scouts and other nonprofit organizations to solicit funds in the Arcade.

The Netherland Hilton operated in the Carew Tower hotel space for many years until late 1981. During its existence, the hotel's employees were represented by the Hotel, Motel, Restaurant Employees and Bartenders Union Local 12, an affiliate of the AFL–CIO ("Union"). After the Hilton closed, the hotel space was leased by the Dunfey Corporation, which opened the Netherland Plaza Hotel in October 1983.

The Netherland Plaza Hotel maintains a separate entrance for its employees in an alcove at the end of the Arcade. The employees must use the separate entrance whenever they enter or leave work, and they are prohibited from wearing their uniforms outside the hotel. The employee entrance is generally in use between 5:00 a.m. and 1:00 a.m. as employees report to or leave their various shifts.

On June 6 and 8, 1984, union representatives attempted to distribute handbills to people using the hotel employee entrance.

The union hoped to organize the 300 hotel employees, *not* Emery employees, all of whom are already organized. On the days in question, union officials were not hotel employees.

The representatives' attempt to distribute handbills was not their first effort to reach hotel employees. In May 1983, several months before the hotel opened, union president George O'Reilly wrote all former Netherland Hilton employees, informing them that the new hotel was taking job applications and asking them to advise the union if they were hired. In July 1983, the president of the Cincinnati Hotel Employees Council requested to meet with hotel officials to discuss the possibility "of an ongoing relationship" between the union and the hotel similar to the one maintained with the hotel's predecessor. The hotel forwarded the letter to its home office, but it appears from the record that no meeting was ever held. In October 1983, O'Reilly sent a second letter to all former Netherland Hilton employees, urging them to advise him if they had been hired by the hotel. Some former hotel employees responded, indicating they had applied for jobs, but none of the responses indicated that they had been hired.

During this time, O'Reilly also tried to identify the new hotel's employees through local contacts. He asked union members employed at other downtown hotels to find out if they knew anyone who had taken a job with the hotel, and he spoke at other union halls asking for help in getting the names and addresses of the hotel employees. These efforts yielded nothing.

O'Reilly attended opening day at the hotel hoping to recognize former union members. He saw one, a bartender, who was too busy to talk with him during the festivities, and he never saw the bartender again. Over the next eight months, O'Reilly and the union's vice-president ate lunch in a hotel restaurant on three different occasions, each time hoping to speak with hotel service employees. On other occasions, O'Reilly visited the lobby and other parts of the hotel with the hope of speaking with hotel employees; however, these attempts at personal contact were all unsuccessful. O'Reilly could not obtain the full names of employees by observing them because only their first names appeared on their name tags. He could not identify them after they left work because they were not permitted to wear their uniforms outside the hotel.

After more than a year of frustration, O'Reilly and two other Union representatives stood near the employees' entrance in the Arcade and distributed Union handbills to people coming and going to work. After approximately fifteen minutes, Emery security guards informed them soliciting was not permitted, and they would be arrested if they did not leave. They left, but returned two days later. This time they distributed handbills for almost twenty minutes before being threatened with arrest by city policemen summoned by Emery's building superintendent.

Three days later, on June 11, 1984, O'Reilly wrote hotel officials and requested a list of employees' names and addresses. That request was refused. O'Reilly then filed an unfair labor practice charge against Emery. Thereafter, but before a hearing, the Union contacted hotel employees who agreed to provide information regarding other employees. That information, however, has never been forthcoming.

On April 18, 1985, an Administrative Law Judge ("ALJ") issued the decision that Emery had violated section 8(a)(1) of the National Labor Relations Act ("the Act"), codified at 29 U.S.C. § 158(a)(1), by refusing to allow the Union to distribute literature in the Arcade. The ALJ found Emery's unwritten rule against solicitation had not been applied in a discriminatory manner against the Union, but nevertheless held that Emery's private property rights had to yield to the Union's right to distribute literature because it had no other reasonable alternative means of reaching hotel employees. Emery appealed to the Board.

After the ALJ issued his decision, the Board decided *Fairmont Hotel*, 282 N.L.R.B. No. 27, 123 L.R.R.M. 1257 (Nov. 13, 1986). In *Fairmont*, the Board announced a new analytical approach to conflicts be-

tween employers' private property rights and unions' rights. First priority would be given to weighing the relative strengths of each party's claims. The availability of reasonable alternative means of access would be considered only in those cases where the private property and labor rights were relatively equal.

Applying a *Fairmont Hotel* analysis to this case, the Board later found Emery's private property rights in the Arcade were relatively weak and outweighed by the Union's interest in organizational handbilling, which the Board determined was a "core right" inherent in section 7 of the Act. In addition, after reviewing the Union's prior attempts at reaching hotel employees, the Board determined its finding was further justified by the lack of alternative means by which the Union could communicate its message to hotel employees.

The primary issues presented in this appeal are:

(1) whether the Board erred in *Fairmont* by subordinating the availability of alternative means of access in cases of trespassory section 7 activities; and

(2) whether proof that a union has attempted all other alternative means of access is necessary to prove the existence of those means.

## II.

### A.

Our review of Board decisions is governed by the substantial evidence test. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Where there is substantial evidence on the record as a whole to support the Board's conclusions, we must uphold them. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464. The Board's conclusions are entitled to deference if they are based upon a reasonably defensible construction of the Act. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–67, 95 S.Ct. 959, 968–69, 43 L.Ed.2d 171 (1975). "The Board's application of the law to the facts is also reviewed under the substantial evidence standard, and the

Board's reasonable inferences may not be displaced on review." *NLRB v. United States Postal Service*, 841 F.2d 141, 144 (6th Cir.1988) (citing *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir.1987); *Universal Camera Corp.*, 340 U.S. at 477, 71 S.Ct. at 459.

It is also the Board's function to resolve credibility issues. *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984). "[T]hus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Roadway Express, Inc.*, 831 F.2d at 1289.

### B.

Section 7 of the Act (codified at 29 U.S.C. § 157) mandates that employees shall have the right to self-organization. Section 8(a)(1) prohibits employers from interfering with employees' exercise of their Section 7 rights. This combination gives employees the right to organize without employer interference, which is "the very core" of the Act. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 1762 n. 42, 56 L.Ed.2d 209 (1978). "The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). Therefore, Section 7 rights must be read to include the right of union officials to discuss organization with employees and distribute organizational literature. *Sears*, 436 U.S. at 206 n. 42, 98 S.Ct. at 1762 n. 42; *Central Hardware Co. v. NLRB*, 407 U.S. 539, 542, 92 S.Ct. 2238, 2240, 33 L.Ed.2d 122 (1972).

The "general rule" in conflicts between private property rights and Section 7 rights is that employers may bar nonemployees from engaging in trespassory organizational solicitation. *Sears*, 436 U.S. at 205, 98 S.Ct. at 1761. From this general rule, how-

ever, is the exception of *"Babcock* accommodation." *Id.; Hudgens v. NLRB,* 424 U.S. 507, 521, 96 S.Ct. 1029, 1037, 47 L.Ed. 2d 196 (1976); *Central Hardware,* 407 U.S. at 544, 92 S.Ct. at 2241; *Babcock & Wilcox,* 351 U.S. at 112, 76 S.Ct. at 684. As explained in *Babcock,* Section 7 rights and private property rights must be accommodated "with as little destruction of one as is consistent with the maintenance of the other." *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684. To gain access to an employer's property, a union must show (1) it has "no other reasonable means" of reaching the employers *or* (2) "the employer's access rules discriminate against union solicitation." *Sears,* 436 U.S. at 205, 98 S.Ct. at 1761; *see also, Babcock,* 351 U.S. at 112, 76 S.Ct. at 684. In every case, "the primary responsibility for making this accommodation" rests with the Board. *Hudgens,* 424 U.S. at 522, 96 S.Ct. at 1037.

### C.

■ Emery's first contention is that the *Fairmont Hotel* standard erroneously subordinates the issue of reasonable alternative means of access to the hotel employees to other factors. We agree.

Decided in 1956, *Babcock* was a consolidation of appeals from the Fifth, Sixth and Tenth Circuits. In each case, the employer had refused to permit distribution of union literature by nonemployee union organizers on the employer's private property. The Board decided in each case that it was unreasonably difficult for union organizers to reach the employees off company property, and, therefore, the employer's actions violated the employees' right to obtain union information. The Supreme Court reversed, ruling an employer may prohibit trespassory union solicitation by nonemployees if reasonable efforts through other available alternative channels of communication would reach the employees. *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684. The Court was of the view that several alternative means were available to the unions, including personal contacts on streets or in homes, letters and telephone calls, and off-premises meetings. These alternative means would be especially effective because a large block of the employees lived

in concentrated neighborhoods and were easily accessible. *Id.* at 113, 76 S.Ct. at 685.

Later, in *Hudgens,* the owner of an indoor shopping mall threatened to arrest union members who were picketing a retail store inside the mall. The Board ruled that Hudgens' threats violated the employees' First Amendment rights. The Supreme Court vacated that judgment and remanded the case for reconsideration under the Act. The Court ruled in part that "the constitutional guarantee of free expression has no part to play in a case" of conflicting Section 7 and private property rights. *Hudgens,* 424 U.S. at 531, 96 S.Ct. at 1042.

The Supreme Court considered *Babcock* accommodation most recently in *Sears.* The Court was largely concerned with resolving the preemption issues involved where an employer filed a state trespass charge against picketers in a labor dispute. One factor considered in the preemption question was the plausibility of the union's claim that its picketing on the employer's property was protected under Section 7. The Court found the union's claim not very plausible, largely because "experience under the Act teaches that such situations [where Section 7 rights prevail over private property rights] are rare and that a trespass is far more likely to be unprotected than protected." *Sears,* 436 U.S. at 205, 98 S.Ct. at 1761. The Court noted:

> While *Babcock* indicates that an employer may not always bar nonemployee union organizers from his property, his right to do so remains the general rule. To gain access, the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists or that the employer's access rules discriminate against union solicitation.

*Id.* (footnote omitted).

In *Giant Food Market, Inc. v. NLRB,* 633 F.2d 18 (6th Cir.1980), union members began picketing a food store the day it opened to draw attention to its hiring of nonunion employees. Store officials obtained a temporary restraining order and had the picketers moved away from the storefront area. *Id.* at 20. The union eventually filed an unfair labor practices

complaint. An ALJ dismissed the complaint, but the Board reversed, ruling that the union activity was protected under Section 7. *Id.* at 21.

After considering *Babcock* accommodation, we ruled that if area standards picketing was protected by Section 7, the picketers "must be allowed a reasonable means of communicating with [their intended audience]." 633 F.2d at 24. When the audience comes from a large, metropolitan area, we held that "expensive, extensive mass media or mailing campaigns should not be required" to show the reasonableness of trespassory union activity. *Id.* "If reasonableness is a criterion for determining whether or not an alternative means of communication exists, the union should not be forced to incur exorbitant or even heavy expenses." *Id.* We then remanded the case for a determination of whether area standards picketing is protected by Section 7. *Id.* at 26.

The above cases illustrate that *Babcock* accommodation anchors the necessity of trespass in the availability of other reasonable means of reaching the desired audience. *Sears,* 436 U.S. at 205, 98 S.Ct. at 1761; *Babcock,* 351 U.S. at 113, 76 S.Ct. at 685; *Giant Foods,* 633 F.2d at 23–24. Where other reasonable means of access exist, there can be no necessity for trespass (absent a showing that an employer's access rules discriminate against union solicitation). Conversely, *Babcock* accommodation can only apply where it has been determined that no reasonable alternative means of access exist. Thus, the existence of such alternatives is a threshold question, not something to be considered only when all other factors balance out.

The error in *Fairmont Hotel* becomes evident upon consideration of the problem that a union seeking to exercise a core Section 7 right would automatically prevail over a weak private property right, regardless of plentiful alternative means of access and the lack of necessity for trespass. Similarly, a union seeking to exercise a less important Section 7 right would be defeated by a strong private property interest,

regardless of an absolute lack of alternative means of access. *Fairmont Hotel* would bring these results in the name of *Babcock,* but this would be contrary to the accommodation principle. The Board has now recognized these defects in *Jean Country; and Brook Shopping Centers, Inc., As Nominee For Dollar Land Syndicate,* 291 N.L.R.B. No. 4 (Sept. 27, 1988), wherein the Board revised *Fairmont Hotel* by returning the factor of availability of reasonable alternative means of access to its proper status as something that must be considered in every *Babcock* case.

### D.

■ In the present case, the ALJ ruled for the Union based on the three traditional *Babcock* factors: strength and nature of the Section 7 right asserted; strength and nature of the private property right asserted; and the availability of alternative means of access to the hotel employees. The error of *Fairmont Hotel* was its overly narrow scope, giving priority to the first two factors and omitting the third except in cases where the Section 7 and private property rights offset each other.[1] In this case, however, the Board avoided that error by widening its analysis to find a lack of reasonable alternative means of access.

The Board found the Union was exercising a "core" Section 7 right in attempting to distribute its literature to unorganized employees. The Board next found Emery's asserted private property rights to be rather weak. The evidence showed the Arcade is open for all but one hour a year. It is a shopping center, a means of access to a major hotel and office complex, and a covered thoroughfare used by the public to traverse a downtown city block and to enter or leave the city downtown skywalk system. The Arcade is Emery's private property, but it is hardly the remote, fenced-in factory site or tugboat cabin with which Emery compares it in cases from other jurisdictions.

Emery's private property interest is further undercut by the fact that it permits other groups to solicit in the Arcade. The

---

1. *See Jean Country; and Brook Shopping Centers, Inc., As Nominee For Dollar Land Syndicate,* 291 N.L.R.B. No. 4, slip op. at 3 (Sept. 27, 1988).

proof showed that some groups have been permitted to erect booths and sell things to passersby in the Arcade. In our view, that type of solicitation is at least as disruptive to pedestrian traffic as distributing handbills to those attempting to use a hotel employee entrance. In this regard, we note that the handbilling did not generate any complaints, either from pedestrians or tower tenants. Moreover, an Emery administrator conceded that the Union officials were distributing their handbills in approximately the same location in which the Girl Scouts are allowed to set up their booths, an area the administrator characterized as a "low traffic area."

■ Emery argues that its private property interest deserves special deference because it is an "innocent bystander" in the Union's attempt to organize hotel employees. As the Board properly concluded, this argument is meritless. *Hudgens v. NLRB,* 424 U.S. at 510 n. 3, 96 S.Ct. at 1032 n. 3; *Scott Hudgens and Local 315, Retail, Wholesale & Department Store Union,* 230 N.L.R.B. 414, 95 L.R.R.M. 1351 (1977). As tower owner and lessor, Emery has a direct and significant interest in the financial success of its largest lessee. To hold otherwise would allow employers to avoid the entire Act by setting up shop in leased premises.

Although it followed the *Fairmont* analysis in reviewing Emery's actions, the Board went on to consider whether the Union had any reasonable alternative means of access to the hotel employees. Emery suggests that this additional finding is insufficient to save this case from the taint of *Fairmont Hotel.* The problem with *Fairmont Hotel,* however, is that it is too narrow. The Board did not taint this case by expanding its analysis in the proper direction beyond *Fairmont Hotel;* rather, it salvaged it.

Evidence of possible alternative means of access included the many different ways Union officials attempted to reach the employees before and after the hotel opened. Emery asserts the Union could have done more. For example, it argues Union officials could have kept the employee entrance under surveillance, stalked employees as they left work and approached them on city streets. The Board rejected this argument as patently unreasonable. We agree.

Similarly, Emery asserts the Union could have avoided disrupting Arcade pedestrian traffic by erecting booths and banners at Arcade exits and entrances, stopping all pedestrians going into or leaving the Arcade, and giving them Union literature. There is nothing in the Act or the doctrine of *Babcock* accommodation to suggest that a union is impermissibly lazy in failing to "lay siege" to an area by distributing handbills to all who enter or leave. It is also unreasonable to expect the Union to attempt to reach approximately 300 employees of the hotel by engaging in a blanket advertising blitz of a major metropolitan area. In sum, the Board's conclusion is supported by substantial evidence.[2]

■ Emery's final point of contention is that the Union failed to prove the lack of alternative means of access because it could not show it had actually tried all possible alternative means. Emery's position is that the Union must prove the absence of alternative means through evidence of wasted time, money and a strong showing of futility. The Act does not require such a waste. *See, Giant Food Market,* 633 F.2d at 24; *see also, Huskey Oil N.P.R. Operations, Inc. v. NLRB,* 669 F.2d 643, 645 (10th Cir.1982); *Hutzler Bros. Co. v. NLRB,* 630 F.2d 1012, 1017 (4th Cir. 1980); *Belcher Towing Co. v. NLRB,* 614 F.2d 88, 91 (5th Cir.1980); *but see NLRB v. New Pines, Inc.,* 468 F.2d 427, 429 (2d Cir.1972); *NLRB v. Tamiment, Inc.,* 451 F.2d 794, 799 (3d Cir.1971), *cert. denied,* 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972).

We note that *New Pines* and *Tamiment,* where the courts literally interpreted *Babcock* to require a showing of actual attempts at futility, were decided before *Hudgens* and *Sears,* and have all been re-

---

2. At oral argument, counsel for Emery argued that *Fairmont Hotel* changed the burden of proof from the Union to the property owner thereby tainting the Board's decision and subsequent order. For the reasons set out herein, we find *this argument meritless.*

jected by all of the circuits called upon to decide this issue since 1980. In our view, the contemporary approach is more efficient and consistent. We agree with the Board, which also has ruled that a union seeking trespassory access to an employer's private property must show, based on objective considerations, that reasonably effective alternative means of access were unavailable under the circumstances. "In some contexts, the attempt must in fact have been made to support an objective conclusion that an asserted alternative is not reasonable, although in others the unreasonableness of the asserted alternative may be clear without such an attempt." *Jean Country,* slip op. at 7.

### III.

Accordingly, for the foregoing reasons, Emery's petition to set aside the order of the Board is DENIED, and the Board's petition for enforcement is GRANTED.