**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**OHIO MASONIC HOME, Respondent.**

**No. 89-5016.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1989.

Decided Dec. 18, 1989.

[redacted]

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Paul Hitterman, argued, N.L.R.B., Office of the Gen. Counsel, Washington, D.C., Emil C. Farkas, Regional Director, N.L.R.B. Region 9, Cincinnati, Ohio, for petitioner.

Dean E. Denlinger, argued, Denlinger, Rosenthal & Greenberg, Cincinnati, Ohio, for respondent.

Before: MARTIN and BOGGS, Circuit Judges; and ZATKOFF, District Judge.*

BOGGS, Circuit Judge.

The National Labor Relations Board (the Board) seeks enforcement of its August 31, 1988 order that the Ohio Masonic Home (the Home) rescind a work rule forbidding off-duty employees from engaging in "publicly hostile or adverse confrontations" on its premises. The Board found that this "limited no-access" rule violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by interfering with employees' rights to engage in concerted activities. We agree, and enforce the order of the Board.

I

The Home, occupying over 400 acres near Springfield, Ohio, is a not-for-profit institution owned by the Ohio Masonic Lodges. The Home cares for 385 elderly Masons (or spouses of Masons), ninety percent of whom are over 75, several of whom

---

* The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

are over 100. The average age of the residents is 83. Two-thirds of the residents are ambulatory. The grounds consist of several buildings, including four residence buildings, parking lots, much open recreational space, and a cemetery. All residents have contributed 90% of their income and assets, current and future, to the Home in exchange for lifelong care.

District 1199, WV/KY/OH, National Union of Hospital and Health Care Employees, AFL–CIO, has represented the Home's service and maintenance workers since 1973. About 300 of the Home's employees are in the bargaining unit. Six times between August 1985 and September 1986, off-duty employees gathered in one of the Home's parking lots in order to organize protests to express certain work-related grievances. In one incident, on August 27, 1985, 50 to 75 employees gathered and marched to the Home's administration building. In the lobby, they met with the Home's administrator, Thomas Scott, who told the group that he would meet with its representatives. The group then dispersed.

In July 1986, the Home amended its administrative policy to include in its list of "Offenses Which Require Disciplinary Action" the following:

> Off-duty employees may not enter any buildings or work areas for any activity which is not closely related to or a part of an employee's job. Off-duty employees may not enter the Home's premises to engage in publicly hostile or adverse confrontations. These activities are threatening to the residents and are inconsistent with sympathetic care for the elderly.

After workers planned a march for August 7, 1986, administrator Scott distributed a memorandum to employees warning them that any march would violate the new policy and subject them to disciplinary action. The employees carried out the march, and the Home issued reprimands to each employee involved. On September 4, 1986, off-duty employees again marched on the administration building, and the Home again issued each participant a reprimand.

The Home claims to have adopted the new policy in order to protect the welfare of its residents. There was evidence from the Home's medical director, Dr. W.C. Fippen, that the demonstrations were causing residents severe emotional distress, that a sense of peace and control over their environment was crucial to residents' well-being, and that hostile activities had a pronounced negative effect on the residents.

## II

■ Our review of NLRB decisions is governed by the substantial evidence test. We must uphold the conclusions of the Board where the record contains substantial evidence to support them. *Emery Realty, Inc. v. NLRB,* 863 F.2d 1259, 1262 (6th Cir.1988); 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). We also apply the substantial evidence test to the Board's application of the law to the facts and may not displace any of the Board's reasonable inferences. *Emery Realty,* 863 F.2d at 1262; *NLRB v. United States Postal Service,* 841 F.2d 141, 144 (6th Cir.1988); *NLRB v. United Insurance Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Emery Realty,* 863 F.2d at 1262 (quoting *Roadway Express, Inc. v. NLRB,* 831 F.2d 1285, 1289 (6th Cir.1987)).

In arguing that the evidence is not reasonably adequate to uphold the Board's decision, the Home claims that the Board misapplied the law by refusing to balance the Home's property rights against the Union members' § 7 rights,[1] as required by

---

1. § 7 of the National Labor Relations Act gives employees the rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargain- ing or other mutual aid or protection." 29 U.S.C. § 157. § 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights. 29 U.S.C. § 158(a)(1).

past decisions of the Supreme Court and the Board. The Supreme Court announced the rule in *Hudgens v. N.L.R.B.*, 424 U.S. 507, 521, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976), that "the task of the Board, subject to review by the courts, is to resolve conflicts between § 7 rights and private property rights." The Court stated that the proper accommodation between the two sets of rights depends largely upon the content and context of the § 7 rights being asserted. The Board provided further guidance in *Fairmont Hotel*, 282 N.L.R.B. 139 (1986), holding that:

> it is the Board's task first to weigh the relative strength of each party's claim. If the property owner's claim is a tenuous one, and the Section 7 right is clearly more compelling, then the Section 7 right will prevail.

282 N.L.R.B. at 142. If the respective claims are equally strong, then the Board must determine if the employees had an effective alternative to the means of communication outlawed by the employer's rule; if so, then the property right prevails.

The Board reiterated the *Fairmont Hotel* test, under which denial of access is lawful if the property right outweighs the § 7 right, in *Jean Country*, 291 N.L.R.B. No. 4, 1988 NLRB LEXIS 568 (1988). The Home relies on *Fairmont Hotel* and *Jean Country* in arguing that this court must refuse to enforce the Board's order, on the ground "that the order has no reasonable basis in law." *Roadway Express, Inc.*, 831 F.2d at 1289.

■ The Board apparently concedes that it considered only the employees' § 7 rights in determining that the Home's no-access rule violated § 8(a)(1); it did not weigh the § 7 rights against the Home's property rights, as the Home contends it must. We hold that *Jean Country* and *Fairmont Hotel* do not require the Board to perform such a balancing test in this case. The facts of those two cases are easily distinguishable from our facts.

In both *Fairmont Hotel* and *Jean Country,* the demonstrators were not employees of the property owners. In *Fairmont Hotel,* the hotel sought to ban handbilling by members of a union which did not claim to represent or wish to organize any of the hotel's employees. Union members were distributing handbills to hotel guests asking them not to patronize the hotel as long as it did business with a bakery across town with which the union had a dispute. The employees of the bakery performed no work at the hotel. The union was not seeking to organize the employees of the bakery. The demonstrators had no employment relationship with the property owners and only a very attenuated economic connection. The Third Circuit has recently held that *Fairmont Hotel* is not applicable to cases involving off-duty employees rather than nonemployees. *N.L.R.B. v. Pizza Crust Company of Pennsylvania, Inc.*, 862 F.2d 49, 53 (3d Cir.1988). We agree with the Third Circuit's conclusion.

In *Jean Country*, the NLRB upheld a retail store's denial of access to nonemployee union agents who were picketing to inform shoppers that the store's employees were not represented by a union. By asserting the applicability of *Jean Country*, the Home fails "to make a distinction between rules of law applicable to employees and those applicable to nonemployees." *N.L.R.B. v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). For the same reasons we find *Fairmont Hotel* inapplicable, we decline to apply *Jean Country* to these facts.

### III

■ The Board consistently has judged the validity of no-access rules for off-duty employees according to the three-part test of *Tri–County Medical Center, Inc.*, 222 N.L.R.B. 1089 (1976). In *Tri–County*, the medical center promulgated a rule prohibiting off-duty employees from distributing union literature in the employees' parking lot. In holding the no-access rule invalid, the NLRB concluded:

> such a rule is valid only if it (1) limits access solely with respect to the interior of the plant and other working areas; (2) is clearly disseminated to all employees; and (3) applies to off-duty employees

seeking access to the plant for any purpose and not just to those employees engaging in union activity. Finally, except where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid.

*Id.* at 1089. This is the appropriate test by which to judge the no-access rule promulgated by the Home in July 1986. The terms of the Home's rule limit access to the Home's entire premises. The first prong of the *Tri–County* test holds that a valid rule can limit access only to working areas. The Home argues that the entire premises—all 400 acres—constitutes the working area. The Home is a retirement residence, and the residence includes all the buildings and grounds. The elderly residents contribute 90 percent of their current and future income in exchange for use of the entire facility. It does not follow, however, that because residents are entitled to enjoy the entire 400 acres, the whole property is a work area. Employees perform little work outside the buildings. Furthermore, there is no evidence that the residents made much use of the parking lots and remote areas of the grounds. The Home proffered no evidence that the employees' marches disrupted any health care operation.

The Home's no-access rule also violates the third prong of the *Tri–County* test.[2] The rule does not apply generally to ban access for all purposes, but rather only to ban off-duty employees from engaging in threatening activities.

 Finally, the rule gives the Home the discretion to determine what constitutes "publicly hostile or adverse confrontations." Since employees subject to this rule cannot discern with any certainty what activities will be prohibited, the no-access rule tends to chill activity protected by § 7. The rule, therefore, is unduly vague and violative of § 8(a)(1). *See Great Lakes Steel, Division of National Steel Corpora-*

*tion v. N.L.R.B.,* 625 F.2d 131, 132 (6th Cir.1980).

We are mindful of the rights of the residents of the Home to the serene atmosphere they seek and for which they have paid. The Board has conceded at oral argument that the Home may promulgate and enforce a more narrowly-drawn rule that would protect the residents' tranquility. Such a rule would have to restrict access for all activities, not just for those activities that the Home subjectively decides are "publicly hostile or adverse confrontations." The rule must also apply only to those "working areas" where resident living is usually carried on, or from which the living areas would be disrupted.

The Home is free to recast its no-access rule in line with the dictates of *Tri–County* and in such a way as not to infringe on protected § 7 rights. Enforcement of the Board's order is granted.

---

**2.** The Board does not argue that the Home's rule violates the second prong of the *Tri–County* test. The administrative policy, of which the no-access rule became a part, was disseminated to all employees.