904 F.2d 715
 134 L.R.R.M. (BNA) 2417, 284 U.S.App.D.C.
259, 58 USLW 2727,
116 Lab.Cas. P 10,244
 LABORERS' LOCAL UNION NO. 204, LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD,
Hardee's Food Systems, Inc., Intervenor.
 No. 89-1535.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 14, 1990.
Decided June 5, 1990.
 
 Walter Kamiat, with whom Laurence Gold, Laurence Cohen, Robert Connerton, Washington, D.C., and Theodore Green were on the brief, for petitioner.
 Fred L. Cornnell, Atty., N.L.R.B., with whom Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, D.C., and Peter Winkler, Atty., N.L.R.B., were on the brief, for respondent.
 David M. Vaughan, Atlanta, Ga., was on the brief, for intervenor.
 Before RUTH BADER GINSBURG, SILBERMAN and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.
 RUTH BADER GINSBURG, Circuit Judge:
 
 
 1
 Laborers' Local Union No. 204 (Union) petitions this court to review a decision in which the National Labor Relations Board (NLRB or Board) balanced the Union's right to handbill consumers against the private property rights of intervenor Hardee's Food Systems, Inc. (Hardee's). The Board determined that the balance favored Hardee's and therefore dismissed a complaint that Hardee's had committed an unfair labor practice by causing the arrest of trespassing Union handbillers. We conclude that the legal standard employed by the NLRB was proper and the Board's accommodation of the conflicting rights of Hardee's and the Union reasonable; we therefore deny the petition for review.
 
 I.
 
 2
 Hardee's operates restaurants throughout the United States, including one in Brazil, Indiana, and three in Terre Haute, fifteen miles from Brazil. In January 1984, Hardee's hired Perry Building Contractors (Perry) as general contractor to remodel Hardee's Brazil store. The store remained open for business during the remodeling.
 
 
 3
 Based on conversations with workers at the remodeling site, the Union, which represents construction workers in the Brazil and Terre Haute area, suspected that Perry was paying the nonunion workers on the Hardee's job less than the union area standard. The Union, after briefly picketing in front of the Brazil restaurant, began passing out handbills to prospective customers urging them to boycott Hardee's because of Perry's failure to pay union wages.
 
 
 4
 On January 27, 1984, representatives of the Union, Perry, and Hardee's met to discuss the situation. Perry maintained that it was paying wages comparable to area standards, but Hardee's admitted that it had not budgeted enough to pay prevailing rates. Hardee's promised that its contractor would pay union wages in upcoming remodeling planned for the Terre Haute stores and urged the Union to cease handbilling. The Union agreed to a temporary halt subject to proof of Perry's claim that its wages met the area standard.
 
 
 5
 When Perry failed to provide this proof, the Union, on February 4, 1984, resumed handbilling at the Brazil store and also commenced handbilling at the three Terre Haute Hardee's. The handbilling at the Terre Haute stores was conducted on parking lots owned by Hardee's but open to the general public. Shortly after the handbilling began, a Hardee's employee at one of the Terre Haute stores called the police. The handbillers, one at each of the Terre Haute stores, were subsequently arrested.[1]
 
 
 6
 The Union filed charges with the NLRB's General Counsel, and the General Counsel issued a complaint asserting that Hardee's had violated section 8(a)(1) of the Labor Management Relations Act (Act), 29 U.S.C. Sec. 158(a)(1).[2] After a hearing, the presiding Administrative Law Judge (ALJ) dismissed the complaint. The ALJ found that the Union's handbilling was protected under section 7 of the Act, 29 U.S.C. Sec. 157,[3] but was conducted on private property. He proceeded to balance the property rights of Hardee's against the Union's publicity rights, and found the interests on both sides relatively weak. Ultimately, the ALJ concluded that the property rights predominated because the record failed to show that mass media communication did not afford the Union a reasonable alternative to the trespassory handbilling. Hardee's Food Systems, Inc. and Laborers Local No. 204, slip op. at 12 (Mar. 29, 1985), reprinted in 294 N.L.R.B. No. 48 (May 31, 1989).
 
 
 7
 The NLRB affirmed the ALJ's findings of fact and upheld his dismissal of the complaint. Specifically rejecting the ALJ's position that Union recourse to the mass media had to be disproved as an accessible, reasonable alternative to handbilling, the Board relied on its reasoning in Jean Country, 291 N.L.R.B. No. 4 (Sept. 27, 1988); issued after the ALJ's decision in this controversy, Jean Country sets out elaboratively the Board's comprehension of the law on trespassory handbilling. The Board agreed with the ALJ that both the property rights asserted by Hardee's and the section 7 rights claimed by the Union were comparatively weak. Pivotal in the Board's analysis was the uninhibited access the Union had to handbilling at the Brazil store. The Union's dispute was primarily with construction contractor Perry, and only secondarily with Hardee's, the Board stressed. Access to Hardee's customers at the store where Perry was performing the remodeling work, paying less than prevailing area wage rates, the NLRB concluded, constituted a reasonable means of reaching an appropriate audience. Hardee's Food Systems, Inc. and Laborers Local No. 204, 294 N.L.R.B. No. 48 (May 31, 1989). The Union petitioned for review.
 
 II.
 
 8
 When a union seeks to engage, on private property, in activity protected by section 7 of the Act,[4] and the property owner objects, resolution of the conflict requires a comparative evaluation, with a view to accommodation, of the opposing interests. See Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). The "primary responsibility" for accommodating section 7 and property rights "must rest with the Board in the first instance." Hudgens, 424 U.S. at 522, 96 S.Ct., at 1038. The "locus of that accommodation ... may fall at differing points along the spectrum depending on the nature and strength of the respective [section] 7 rights and private property rights asserted in any given context." Id.
 
 
 9
 A reviewing court may not "displace the Board's choice between two fairly conflicting views" and must defer to the NLRB's determination if the Board's conclusions are supported by substantial evidence on the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); Babcock, 351 U.S. at 112, 76 S.Ct. at 684. When the Board finds that its General Counsel has failed to establish a violation of the Act, this court credits that finding "unless it has no rational basis in the record." International Ladies' Garment Workers Union v. NLRB, 463 F.2d 907, 919 (D.C.Cir.1972).
 
 
 10
 The Board based its decision in this case on its analysis, some months earlier, in a pathmarking opinion, Jean Country, supra. Jean Country restated that when balancing a union's section 7 rights against an owner's property rights, the Board considers the availability of reasonable alternative means by which the union can meaningfully exercise its section 7 rights. See 291 N.L.R.B. No. 4, at 2-3. This consideration, as Jean Country explained, id. at 5, effectuates the Act's command that conflicting rights be accommodated with " 'as little destruction of one [right] as is consistent with the maintenance of the other.' " Hudgens, 424 U.S. at 521, 96 S.Ct. at 1037 (quoting Babcock, 351 U.S. at 112, 76 S.Ct. at 684).
 
 
 11
 The Board also reiterated in Jean Country the Supreme Court's counsel that not all section 7 rights (nor all property rights) are of equal weight in the accommodation analysis. Compare id. at 8 with Hudgens, 424 U.S. at 522, 96 S.Ct. at 1037-38. In particular, the Board stated, "core" section 7 rights, notably, the right to organize employees and the right to protest unfair labor practices, are entitled to more weight in the balance than "less central" section 7 rights, such as protection of area standards. Jean Country, 291 N.L.R.B. No. 4, at 5, 8. Cf. Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 207 & n. 42, 98 S.Ct. 1745, 1762 & n. 42, 56 L.Ed.2d 209 (1978) (suggesting that area standards activity is entitled to less credit in the Hudgens/Babcock calculus).
 
 
 12
 The principle that non-core rights merit less weight in the balance, the Board recognized, should inform the analysis of whether a union has reasonable alternative means to reach the targets of its section 7 activity. Adjustment in the alternative means inquiry, the Board explained, is necessary to correct an anomaly: there is an inverse relationship between the centrality of a section 7 right and the availability of alternative means of exercising the right. As the right a union seeks to advance becomes less central and the union's asserted audience becomes larger (e.g., "consumers" of a product rather than "employees" of the producer), and less connected to the core dispute, alternative means of reaching the asserted audience become more scarce. See Giant Food Markets, Inc. v. NLRB, 633 F.2d 18, 24 (6th Cir.1980) (observing that generally it will be easier to communicate with a specific number of discrete employees than with potential customers of a large retail store). The Board can deal with this anomaly effectively only if "a union's own definition of the audience it seeks to reach" does "not necessarily control the analysis of what other means of communication constitute reasonable alternatives." Jean Country, 291 N.L.R.B. No. 4, at 5-6. The elaboration thus advanced in Jean Country, we are satisfied, sensibly construes the Act in light of High Court precedent in point.
 
 
 13
 The Board's application of Jean Country to this case was also entirely reasonable. The Board explained that the section 7 rights at issue were not "core" in character. The Union sought to enforce area standards. It did not represent or seek to represent any employees of Perry or of Hardee's. The section 7 activity, moreover, interfered with the property rights not of Perry, the below union rate wage payer, but of Hardee's. Finally, the property on which the Union members trespassed was located fifteen miles from the site of the targeted activity.
 
 
 14
 The Board acknowledged that the property interests asserted by Hardee's were not compelling. The handbilling had been performed unobtrusively in parking lots that were generally treated as public property. Given the competing concerns and the particular facts presented, however, the Board reasonably concluded that the Union had satisfactory alternative means of reaching the relevant audience addressed by the handbilling.
 
 
 15
 As the Board explained in Jean Country, "a claim that the union's intended audience consists of customers of every establishment that has even a remote connection to [the primary] target employer will not necessarily warrant access to any and all sites at which such customers may be found, even if access to private property might be necessary to reach customers at one such site." Jean Country, 291 N.L.R.B. No. 4, at 6. Handbilling at the Brazil store, which Hardee's condoned, permitted the Union to reach Hardee's customers at the location where Perry, the Union's central target, was performing the disputed activity. Given Hardee's attenuated connection to this activity and the boundless number of potential Hardee's customers, the Board reasonably concluded that access to prospective customers of the Brazil store was a sufficiently effective means for the Union to convey its handbill message.
 
 
 16
 In reaching this conclusion, the NLRB, contrary to the Union's assertions, did not treat as a unifocal matter the Union's dispute over Perry's failure to pay workers union scale. The Board maintained that Perry was the "primary target" of the handbilling, but also acknowledged that Hardee's was a "secondary target." See 294 N.L.R.B. No. 48, at 5. Typing Hardee's as a "secondary" target was reasonable. The Union's handbills identified only Perry's activity as the source of the Union's grievance. A Union officer acknowledged that the aim of the boycott of Hardee's advocated in the handbills was to force Perry to pay area standard wages; another testified that the Union would not have handbilled in Terre Haute if Perry had raised its wages. Joint Appendix (J.A.) at 79, 143. Hardee's had not, to the Union's knowledge, previously hired contractors who paid substandard wages, and had promised not to use such contractors in the upcoming Terre Haute work. J.A. at 133-34, 327.
 
 
 17
 The NLRB recognized that section 7 permitted the Union to put pressure on Hardee's even though Hardee's was a secondary target. The Board expressly found that "[a]lthough [the handbillers were not employees of the Respondent or Perry], the handbillers' activity is still protected." See 294 N.L.R.B. No. 48, at 4 n. 4. At the same time, the NLRB determined that the secondary nature of the dispute was relevant to "the strength of the Union's asserted [section] 7 right." Id. This conclusion was fully in accord with both Jean Country and Supreme Court precedent. See Hudgens, 424 U.S. at 521-22 & n. 10, 96 S.Ct. at 1037 & n. 10 (noting the relevance of both whether union activity is carried on by employees or nonemployees and whether the property interests impinged upon are those of the offending employer or someone else); Jean Country, 291 N.L.R.B. No. 4, at 5, 8. In sum, the Board's order gave fair weight and effect to the Union's right to exert pressure on Hardee's by means of a consumer boycott, but the Board resisted trenching unduly on Hardee's property rights. We have no cause to upset the reasonable balance struck by the Board.
 
 
 18
 For the foregoing reasons, we deny the petition for review.
 
 
 19
 It is so ordered.
 
 
 
 [1]
 Hardee's did not prefer charges, and the handbillers were not prosecuted. The next day, February 5, 1984, handbilling resumed at the three Terre Haute restaurants without intervention by Hardee's
 
 
 [2]
 Section 8(a)(1) provides:
 It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]....
 29 U.S.C. Sec. 158(a)(1).
 
 
 [3]
 Section 7 provides in relevant part:
 Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
 29 U.S.C. Sec. 157.
 
 
 [4]
 See supra note 3